**No. 15-1773**

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

—————————————

REG SYNTHETIC FUELS, LLC,
*Patent Owner-Appellant*,

v.

NESTE OIL OYJ,
*Petitioner-Appellee*.

—————————————

Appeal from the United States Patent and Trademark Office, Patent
Trial and Appeal Board, in IPR2013-00578

—————————————

## OPENING BRIEF OF APPELLANT
## REG SYNTHETIC FUELS, LLC

—————————————

Jeanne M. Gills
Michael R. Houston
FOLEY & LARDNER LLP
321 North Clark Street
Suite 2800
Chicago, Illinois 60654
(312) 832-4500

*Attorneys for Appellant*
*REG Synthetic Fuels, LLC*

September 23, 2015

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

REG Synthetic Fuels, LLC     **v.**     Neste Oil Oyj

Case No.     15-1773

## CERTIFICATE OF INTEREST

Counsel for the (petitioner) (appellant) (respondent) (appellee) (amicus) (name of party)

REG Synthetic Fuels, LLC     certifies the following (use "None" if applicable; use extra sheets if necessary):

1.     The full name of every party or amicus represented by me is:

REG Synthetic Fuels, LLC

2.     The name of the real party in interest (Please only include any real party in interest NOT identified in Question 3. below) represented by me is:

None.

3.     All parent corporations and any publicly held companies that own 10 percent of the stock of the party or amicus curiae represented by me are listed below. (Please list each party or amicus curiae represented with the parent or publicly held company that owns 10 percent or more so they are distinguished separately.)

Renewable Energy Group, Inc.

4.  ☒   The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court (and who have not or will not enter an appearance in this case) are:

Foley & Lardner LLP (Joseph P. Meara; R. Spencer Montei)

09/23/2015
Date

/s/ Jeanne M. Gills
Signature of counsel

Please Note: All questions must be answered

cc:

Jeanne M. Gills
Printed name of counsel

Reset Fields

# TABLE OF CONTENTS

Table of Authorities ......................................................................................v

Statement of Related Cases............................................................................1

Jurisdictional Statement ................................................................................1

Statement of the Issues..................................................................................1

Statement of the Case....................................................................................3

    I.     The Subject Matter of the '804 Patent ..................................................4

    II.    The Prior Art ..........................................................................................7

    III.   Mr. Abhari's Discovery of a Composition Containing a High
          Concentration of Even-Carbon-Number Paraffins Made from
          Naturally-Occurring Fatty Acids and Esters ........................................8

          A.    Mr. Abhari's Conception in the Syntroleum Laboratory...........8

          B.    Intertek's Production of the Claimed Composition .................14

          C.    SwRI's Pilot-Scale Production of the Claimed
                Composition and Regular Reporting of Composition
                Data .........................................................................................15

          D.    Mr. Abhari's Communication with Microtek, a Producer
                of Phase Change Materials.......................................................19

          E.    Mr. Abhari's Involvement in the Construction of a Full-
                Scale Production Plant To Manufacture the Claimed
                Composition .............................................................................21

Summary of the Argument............................................................................22

Standard of Review.......................................................................................25

Argument.......................................................................................................26

    I.     The Board Erroneously Found Claims 1-3, 5, and 8 Anticipated
          By Dindi ...............................................................................................26

A.    The Board Erred in Defining the Scope of Invention to Include Use of the Compositions as Phase Change Materials (PCMs) ..................................................................... 28

    1.    Conception Only Requires REG To Prove that Mr. Abhari Appreciated the Fact of the Composition He Discovered, not that the Composition Was Patentably "New" ............................................................ 30

    2.    The Usefulness of the Claimed Compositions Was Obvious ......................................................................... 31

B.    The Board Erred in Refusing to Consider Numerous REG Exhibits Supporting its Invention Date Claim ................ 33

    1.    Exhibits 2003 and 2006 Should Not Have Been Excluded as Non-Authenticated .................................... 33

    2.    Exhibits 2012 and 2013 Should Not Have Been Excluded as Hearsay ....................................................... 35

    3.    Exhibit 2062 Has Evidentiary Value Independent of its Truth and Should Have Been Considered for Those Purposes ................................................................ 38

    4.    Exhibit 2053 Should Not Have Been Excluded as Improper Reply Evidence .............................................. 39

    5.    Exhibits 2003, 2006, 2012, 2013, 2053, 2057, 2061, and 2062 Should All Have Been Considered Under the Conception Analysis ..................................... 41

C.    The Board Erred in Failing To Find an Earlier Conception by Mr. Abhari that Predated Dindi ....................... 49

    1.    Even the Evidence Found Admissible by the Board Sufficiently Corroborates Mr. Abhari's Conception of the Invention ............................................................. 50

    2.    The Evidence Improperly Excluded by the Board Further Corroborates Mr. Abhari's Conception ............ 53

4830-5985-6423.

3.    The Record Evidence Establishes a Reduction to Practice ..........................................................................57

II.    The Board Erroneously Found Claims 1, 3, 4 and 8 Anticipated by Craig ...............................................................................59

A.    The Board's Analysis Was Grounded in Inherency .................59

B.    The Board's Inherency Analysis Applied an Incorrect Standard ...................................................................................61

C.    Substantial Evidence Does Not Support the Board's Conclusion, as All Objective Evidence Contradicts the Board's Position ......................................................................63

Conclusion ........................................................................................66

iv

# TABLE OF AUTHORITIES

**Cases**                                                               **Page(s)**

*Air Land Forwarders, Inc. v. U.S.*,
  172 F.3d 1338 (Fed. Cir. 1999) ...................................................36, 37

*In re Arkley*,
  455 F.2d 586 (C.C.P.A. 1972) .........................................................62

*Berges v. Gottstein*,
  618 F.2d 771 (C.C.P.A. 1980) ....................................................35, 50

*Berry v. Webb*,
  412 F.2d 261 (C.C.P.A. 1969) .........................................................49

*Borror v. Herz*,
  666 F.2d 569 ...................................................................39, 49, 58

*Burroughs Wellcome Co. v. Barr Labs., Inc.*,
  40 F.3d 1223 (Fed. Cir. 1994) ....................................................31, 53

*Chen v. Bouchard*,
  347 F.3d 1299 (Fed. Cir. 2003) ..................................................26, 35

*In re Clarke*,
  53 C.C.P.A. 954 (C.C.P.A. 1966)......................................................30

*Coleman v. Dines*,
  754 F.2d 353 (Fed. Cir. 1985) ....................................................42, 49

*Cont'l Can Co. v. Monsanto Co.*,
  948 F.2d 1264 (Fed. Cir. 1991) .......................................................61

*Dow Chem. Co. v. Astro-Valcour, Inc.*,
  267 F.3d 1334 (Fed. Cir. 2001) ............................................30, 32, 53

*Field v. Knowles*,
  183 F.2d 593 (C.C.P.A. 1950) .........................................................42

*Finnigan Corp. v. International Trade Commission*,
  180 F.3d 1354 (Fed. Cir. 1999) ..................................................60, 61

v

*Hasselstrom v. McKusick*,
   324 F.2d 1013 (C.C.P.A. 1963) ............................................................43, 44, 45

*Hybritech Inc. v. Monoclonal Antibodies, Inc.*,
   802 F.2d 1367 (Fed. Cir. 1986) .......................................... 43, 44, 46, 47, 49, 50

*Invitrogen Corp. v. Clontech Labs., Inc.*,
   429 F.3d 1052 (Fed. Cir. 2005) ....................................................................29, 30

*Knorr v. Pearson*,
   671 F.2d 1368 (C.C.P.A. 1982) ........................................................................42

*Koninklijke Philips Elecs. N.V. v. Cardiac Sci. Operating Co.*,
   590 F.3d 1326 (Fed. Cir. 2010) ........................................................................26

*Mann v. Werner*,
   347 F.2d 636 (C.C.P.A. 1965) ....................................................................34, 50

*Medichem, S.A. v. Rolabo, S.L.*,
   437 F.3d 1157 (Fed. Cir. 2006) ........................................................................26

*MEHL/Biophile Int'l Corp. v. Milgraum*,
   192 F.3d 1362 (Fed. Cir. 1999) ........................................................................66

*Meitzner v. Corte*,
   537 F.2d 524 (C.C.P.A. 1976) ..........................................................................50

*Rapoport v. Dement*,
   254 F.3d 1053 (Fed. Cir. 2001) ........................................................................25

*Sanofi-Synthelabo v. Apotex, Inc.*,
   550 F.3d 1075 (Fed. Cir. 2008) ........................................................................62

*Silvestri v. Grant*,
   496 F.2d 593 (C.C.P.A. 1974) ..........................................................................32

*Teva Pharm. Indus. v. Astrazeneca Pharms. LP*,
   661 F.3d 1378 (Fed. Cir. 2011) ....................................................................29, 30

*Townsend v. Smith*,
   36 F.2d 292 (C.C.P.A. 1930) ............................................................................31

vi

*W.L. Gore & Assocs. v. Garlock, Inc.*,
   721 F.2d 1540 (Fed. Cir. 1983) ................................................................26, 62

**Statutes**

28 U.S.C. § 1295(a)(4)(a) ........................................................................1

35 U.S.C. § 141 ........................................................................................1

35 U.S.C. § 318(a) ....................................................................................1

**Other Authorities**

37 C.F.R. § 42.24 ...................................................................................40

Federal Circuit Rule 47.5 ..........................................................................1

FEDERAL RULE OF EVIDENCE 803 ........................................................35, 36

FEDERAL RULE OF EVIDENCE 901 ....................................................33, 34, 35

*Office Patent Trial Practice Guide*, 77 Fed. Reg. 48,756, 48,767
   (Aug. 14, 2012) ..................................................................................40

## STATEMENT OF RELATED CASES

Pursuant to Fed. Cir. R. 47.5, counsel for Appellant, REG Synthetic Fuels, LLC ("REG"), states as follows:

(a)     No other appeal in or from the same proceeding was previously before this or any other appellate court; and

(b)     There are no cases pending in this or any other court that will directly affect or be directly affected by this Court's decision in the pending appeal.

## JURISDICTIONAL STATEMENT

Pursuant to 35 U.S.C. § 141(c), REG appeals from the Final Written Decision (JA1-38) of the Patent Trial and Appeal Board of the United States Patent and Trademark Office under 35 U.S.C. § 318(a), entered on March 12, 2015, in *Inter Partes* Review No. IPR2013-00578.

 REG timely filed a notice of appeal on May 8, 2015, therefore this Court has jurisdiction over this appeal under 35 U.S.C. § 141 and 28 U.S.C. § 1295(a)(4)(a).

## STATEMENT OF THE ISSUES

There are multiple issues presented on appeal.

*First*, the issue is whether the Board erred when it found that claims 1, 3, 5 and 8 of REG's U.S. Patent No. 8,231,804 ("the '804 Patent) were anticipated by

1

Dindi.[1] Certain REG evidence offered to corroborate conception—the formation and appreciation of a chemical composition—was excluded as hearsay and as having no non-hearsay relevance under the "rule of reason" analysis. Specifically, the Board excluded evidence corroborating the inventor's conception of a composition containing mainly even-carbon-number paraffins as hearsay, and as having no non-hearsay relevance. This error led to the erroneous finding that the inventor's testimony was not corroborated under the "rule of reason." Having improperly excluded REG's corroborating evidence, and likewise failing to give proper weight to the other evidence that was admitted and considered, the Board determined that REG failed to antedate Dindi. This was legal error.

***Second***, the issue is whether the Board erred when it found that claims 1, 3, 4, and 8 of the '804 Patent were anticipated by Craig.[2] Specifically, the Board disregarded the objective evidence of record in concluding it is "unlikely" that Craig discloses a composition comprising less than 75 wt % even-carbon-number paraffins. The Board therefore based its inherent anticipation determination on the mere probability or possibility that Craig teaches the "at least 75 wt % even-carbon-number paraffins" weight percentage. An inherency analysis based on nothing more than probability or possibility is legal error. In this case, that error led the Board to erroneously conclude that the '804 Patent is anticipated by Craig.

---

[1] U.S. Patent Publication US 2008/0312480 A1 (Dec. 18, 2008).
[2] U.S. Patent No. 4,992,605 (Feb. 12, 1991).

2

REG asks this Court to reverse the Board's decisions with respect to its conception analysis as to Dindi and its inherency finding as to Craig. Alternatively, the Board's decisions should at least be vacated and remanded for further proceedings in view of all admissible evidence and under the correct legal standards.

## STATEMENT OF THE CASE

This is an appeal of the Final Written Decision in IPR2013-00578. (JA1-38.) Appellee Neste Oil Oyj ("Neste") filed an amended petition requesting *inter partes* review of claims 1-5 and 8 of the '804 Patent. Trial was instituted on claims 1-5 and 8 on the following grounds: (1) whether 1-4 and 8 are unpatentable as anticipated by Craig; (2) whether 1-3, 5, and 8 are unpatentable as anticipated by Dindi; (3) whether claims 1-3 and 8 are unpatentable as anticipated by Kubíčka; and (4) whether claim 5 is unpatentable as obvious over the teachings of Kubíčka and Gusmão. (JA125-145 at JA143-44.) Neste failed to meet its burden of proving the public availability of Kubíčka (JA15), and Neste did not cross-appeal this issue. However, the Board found claims 1-3, 5, and 8 anticipated by Dindi, and claims 1, 3, 4, and 8 anticipated by Craig. (JA24-27; JA37-36.)  REG appeals both of these erroneous findings.

Facts relevant to the issues identified above are as follows:

3

## I.    The Subject Matter of the '804 Patent

The '804 Patent is directed toward paraffin compositions containing mainly even-carbon-number paraffins and methods for making the same. (JA39-53 at JA39.) These compositions are useful for a number of applications. Some applications identified in the patent and prior art include specialty materials, chemical intermediates, lubricant/wax additives, and cetane-enhanced diesel fuel. (JA48, JA52, JA53.) Another application for these compositions is as phase change materials ("PCMs"), which use the latent heat of the paraffins as a passive thermal storage device. (JA39.) For example, PCMs can be utilized in the wallboards of a home to absorb heat during the day and release heat at night. (JA48.)

The thermal storage capacity of PCMs is determined by the PCMs' latent heat. (*Id.*) However, not all paraffins are created equal, as the latent heat of even-carbon-number paraffins is higher than the latent heat of odd-carbon-number paraffins with similar melting points. (*Id.*) While it had long been known that paraffins could be derived from biological raw materials (*id.*), the inventor of the '804 Patent, Ramin Abhari, discovered compositions produced from biological materials having a relatively higher proportion of even-carbon-number paraffins as compared to odd-carbon-numbered paraffins. (JA49.)

Biological materials useful in the invention contain chemicals known as triglycerides, which comprise fatty acid chains attached to a glycerol backbone.

4

(*Id.*; JA2885.) In naturally-occurring triglycerides, the fatty acid chains are predominantly even-carbon numbered. (JA2885.) To convert the fatty acid chains into paraffins, triglycerides are subjected to a hydrogenation/hydrogenolysis process that removes oxygen and adds hydrogen. During this process, there are two main reaction pathways that simultaneously compete for converting the triglycerides to paraffins. (JA2884-85.) These pathways are referred to as oxygen hydrogenolysis (sometimes called "hydrodeoxygenation" or "HDO") and decarboxylation/decarbonylation (sometimes referred to as "DCO"), which are illustrated by equations (1) and (2) below, respectively:

$$(1)$$

$$\begin{array}{l} CH_2\!-\!O\!-\!CO\!-\!C_{17}H_{33} \\ CH\!-\!O\!-\!CO\!-\!C_{17}H_{33}\;\; + 15\,H_2 \longrightarrow 3\,C_{18}H_{38} + C_3H_8 + 6\,H_2O \\ CH_2\!-\!O\!-\!CO\!-\!C_{17}H_{33} \end{array}$$

$$(2)$$

$$\begin{array}{l} CH_2\!-\!O\!-\!CO\!-\!C_{17}H_{33} \\ CH\!-\!O\!-\!CO\!-\!C_{17}H_{33}\;\; + 6\,H_2 \longrightarrow 3\,C_{17}H_{36} + C_3H_8 + 3\,CO_2 \\ CH_2\!-\!O\!-\!CO\!-\!C_{17}H_{33} \end{array}$$

(JA49.) In both reactions, hydrogenation/hydrogenolysis converts the glycerol backbone to propane and saturates any double bonds in the fatty acid chains with hydrogen. (*Id.*) However, in the decarboxylation/decarbonylation reaction illustrated by equation (2), one carbon is removed from each of the fatty acid chains, resulting in an odd-carbon-number paraffin. (*Id.*) In the hydrodeoxygenation reaction illustrated by equation (1), only water is removed,

such that the even number of carbon atoms in the naturally-occurring fatty acid is preserved.

The '804 Patent discloses a process for converting biological feedstocks into paraffin compositions whereby a high proportion of even-carbon-number paraffins are obtained. (JA48-49; JA2883-84.) The claims at issue here are directed to these compositions. Claim 1 is illustrative of the claimed compositions:

> 1.    A phase change material composition comprising at least 75 wt% even carbon number paraffins, wherein the paraffins are produced by hydrogenation/hydrogenolysis of naturally occurring fatty acids and esters.

(JA53.) Mr. Abhari discovered this composition while conducting a test procedure in Syntroleum's[3] catalyst laboratory. (JA2639-46.) Recognizing the new composition and the beneficial possibilities created by the high concentration of even-carbon-number paraffins, he repeated his tests internally many times, then commissioned additional tests to demonstrate his discovery at a larger scale, all leading to the construction of plant in Louisiana to commercialize his invention. (JA26339-69.) The details of Mr. Abhari's discovery are described in greater detail in Section III below.

---

[3] Syntroleum is REG's predecessor-in-interest to the '804 patent. REG acquired Syntroleum during the pendency of the IPR giving rise to this appeal. For purposes of this appeal and the evidence cited herein, references to Syntroleum or REG should be considered synonymous.

6

## II.    The Prior Art

The Board based its invalidity decision on two references: Dindi and Craig. (JA36-37.) Dindi is a U.S. Patent Application Publication with a filing date of June 18, 2008 (JA651-60 at JA651), over a year after Mr. Abhari's conception. (JA2645-49.)    Dindi generally describes a process for converting renewable resources such as vegetable oil and animal fat into paraffins in a single step, where a renewable resource feed is contacted with hydrogen and a catalyst comprising molybdenum to produce a hydrocarbon product having a ratio of even-numbered hydrocarbons to odd-numbered hydrocarbons of at least 2:1. (JA651.) The Board concluded that Examples 10 and 14 in Dindi anticipate claims 1-3, 5, and 8 of the '804 Patent. (JA27.)

Craig is a U.S. Patent issued February 12, 1991, and is directed to a process for producing hydrocarbon products in the diesel boiling range, comprising mainly $C_{15}$-$C_{18}$ paraffins and being effective to improve diesel fuel ignition. (JA644-50 at JA644.) The Board concluded that Table 9 disclosed naturally occurring feedstocks and the makeup of the hydrocarbon product obtained from each. (JA27.) The Board further concluded that Table 9 disclosed the results of a GC-MS (*i.e.*, GC "mass spectrometry") analysis of those products, expressed as peak-area percentages of each hydrocarbon. (*Id.*) Despite not disclosing weight percentages of those hydrocarbons, and despite concluding that area percentage and weight

7

percentages were not equivalent, the Board nonetheless concluded that Table 9 of Craig anticipates claims 1, 3, 4, and 8 of the '804 Patent. (JA33.)

### III. Mr. Abhari's Discovery of a Composition Containing a High Concentration of Even-Carbon-Number Paraffins Made from Naturally-Occurring Fatty Acids and Esters

Mr. Abhari invented the composition claimed by the '804 Patent during the course of his work as an engineer for Syntroleum in late May 2007. The record reflects not only Mr. Abhari's detailed work, but also the detailed work and reports of others acting under his direction and supervision both before and after his invention. Third-party laboratories commissioned by Mr. Abhari subsequently confirmed and reproduced his invention on a larger scale.

#### A.    Mr. Abhari's Conception in the Syntroleum Laboratory

Conducting a test procedure in Syntroleum's catalyst laboratory using a slurry reactor, Mr. Abhari combined a feedstock of canola oil with nickel molybdenum (NiMo) oxide catalyst. (JA2639-40.) The resulting liquid samples were collected from the reactor and were analyzed to determine their composition. (JA2640.) The purpose of Mr. Abhari's work at that time was to develop a method for an activity measurement of deactivated catalysts. (*Id.*)

The small-scale reactor testing conducted by Mr. Abhari and his team used hydrogenation/hydrogenolysis to treat the biological raw material, and consisted of a 1-liter autoclave operated with a batch charge of vegetable (canola) oil and a

8

catalyst, using a continuous flow of hydrogen gas at controlled conditions of temperature, pressure, and agitation rate. (*Id.*) The system allowed for continuous monitoring of the gaseous products through an online gas analyzer, and for sampling of the autoclave during the course of the reaction for liquid product analysis via an offline gas chromatography analyzer with a flame ionization detector ("GC" or "GC-FID"). (*Id.*)

The process pursued by Mr. Abhari is described in detail in a report prepared in June 2007 by one of Mr. Abhari's colleagues, Dr. Gruver, summarizing the testing. (JA2675.)  Dr. Gruver was a Senior Research Chemist at Syntroleum at that time of the invention, and reported directly to Mr. Abhari. (JA2640; JA3351-88 at JA3357-60; JA3389-90.) Dr. Gruver's report includes GC-FID test reports dated May 31, 2007 through June 8, 2007, which show the relative heights of even- and odd-carbon-number paraffins and are indicative of the comparable concentrations of each within the resulting liquid collected from the reactor. (JA2641-42.)

Gas chromatography is a physical separation method used to identify and analyze the components of a mixture. (JA2641.) A gas chromatograph report is a two-dimensional plot containing a series of peaks. (*Id.*) The main pieces of information shown by the plot are: (1) the number of different compounds in the mixture (the number of peaks); (2) the relative amount of each compound present

9

in the mixture (the height of each peak/area under each peak); and (3) the retention time (the position of the peak). (JA2642.) This information may be used to determine the identity and concentration of each component in the tested mixture. (*Id.*)

To determine the component concentrations quantitatively, a gas chromatograph using an "FID" detector is typically used. (JA2640-41; JA656; JA657.) Using GC-FID detection, weight percent concentrations of the mixture can be approximated by the percent area under the peak corresponding to that compound on the chromatogram. (JA2642.) However, when GC machines having a "mass spec" detector ("GC-MS") are used, calibration is critical, especially when quantitative results are desired. (*Id.*; JA2958; JA3025-26, JA3036-37.)

On May 31, 2007, the undistilled product resulting from the hydrogenation/hydrogenolysis of canola oil (the naturally occurring fatty acids and esters) was evaluated by a Syntroleum chemist, Jennifer Parker, at Mr. Abhari's request (her supervisor), using the GC-FID technique described above. (JA2642; JA2685.) Referring to this test, Dr. Gruver's report states: "The chromatogram of the canola oil that served as feedstock contains the family of peaks grouped around of [sic] dominant band with retention time ~27 min, which belong to C18 oleic TG." (JA2676; JA2642-43.) The result of this test, submitted as Exhibit 2004, is shown in Fig. 1 below.

10

**Fig. 1: May 31, 2007 GC-FID Chromatograph**



(JA2676.) As shown in Fig. 1, the GC has one peak that is substantially taller and broader than the rest. Mr. Abhari recognized that the tallest and broadest peak in the graph corresponded to n-octadecane, or n-$C_{18}$, which is an even-carbon-numbered paraffin having 18 carbon atoms. (JA2643-44.) Mr. Abhari recognized that this undistilled product had a very high concentration of $C_{18}$, which Mr. Abhari further understood was an even-carbon-number paraffin. (*Id.*) Exhibit 2004 is date-stamped "5/31/2007" in the lower right corner, and includes the initials "JP," which stand for Jennifer Parker, indicating she was responsible for the GC-FID chromatogram shown above in Figure 1. (JA2676; JA3354-55;

11

JA3390.) Mr. Abhari testified that he reviewed the results on May 31 or the day after. (JA3357-58.) The GC data was also stored in a spreadsheet dated May 31, 2007. An excerpt of that spreadsheet, submitted as Exhibit 2006, is shown below in Figure 2:

**Fig. 2: May 31, 2007 GC-FID Data (excerpt)**

| Group | MW | Mass% | Isomer Mass% | Normal Mass% |
|---|---|---|---|---|
| C6 | 86.2 | 0.0% | 0.0% | 0.0% |
| C7 | 100.2 | 0.0% | 0.0% | 0.0% |
| C8 | 114.2 | 0.0% | 0.0% | 0.0% |
| C9 | 128.3 | 0.0% | 0.0% | 0.0% |
| C10 | 142.3 | 0.0% | 0.0% | 0.0% |
| C11 | 156.3 | 0.0% | 0.0% | 0.0% |
| C12 | 170.3 | 0.0% | 0.0% | 0.0% |
| C13 | 184.4 | 0.0% | 0.0% | 0.0% |
| C14 | 198.4 | 0.1% | 0.0% | 0.1% |
| C15 | 212.4 | 0.3% | 0.0% | 0.3% |
| C16 | 226.5 | 4.2% | 0.0% | 4.2% |
| C17 | 240.5 | 4.4% | 0.0% | 4.4% |
| C18 | 254.5 | 84.6% | 3.6% | 81.0% |
| C19 | 268.5 | 1.3% | 1.0% | 0.3% |
| C20 | 282.6 | 2.2% | 0.2% | 2.0% |
| C21 | 296.6 | 0.2% | 0.0% | 0.2% |
| C22 | 310.6 | 0.4% | 0.0% | 0.4% |

(JA2686-87.)

Thus, Mr. Abhari discovered that hydrocarbon compositions with very high concentrations of even-carbon-number paraffins could be obtained from the hydrogentation/hydrogenolysis of biological feedstocks comprising naturally occurring fatty acids and esters on May 31, 2007, when he reviewed the GC test data in Exhibits 2004 and 2006. (JA2642-47; JA1479.) Prior to the May 2007 test, Mr. Abhari had not obtained a hydrocarbon composition with similarly high

12

concentrations of even-carbon-number paraffins. (JA2633.) By way of contrast, at the time of Mr. Abhari's discovery, the prior art taught that treating canola oil with commercially-available catalysts yielded a product for which the GC chromatogram revealed relatively equal peak heights for the even- and odd-carbon-numbered paraffins, indicating comparable concentrations of each. (JA2648; JA48.)

The table in Figure 2 above shows the weight percent ("wt%") of each paraffin present in the tested sample under the column "Normal Mass%." (JA2645; JA2686.) The concentration of the $C_{18}$ paraffin (the tall peak in Fig. 1) is shown in Fig. 2 as 81.0 wt%.(JA2645; JA2686.) Mr. Abhari recognized that the sample tested in May 2007 was a composition comprising more than 80 wt% even-carbon-number paraffins. (JA2645-46.) In addition to $C_{18}$, Figure 2 also indicates the presence of other even-carbon-number paraffins, including $C_{14}$ (n-tetradecane), $C_{16}$ (n-hexadecane), and $C_{22}$ (n-docosane). (JA2646; JA2686.) Because the May 29, 2007 sample used a canola oil feedstock, it contained naturally-occurring free fatty acids and fatty acid esters. (JA2646; JA2706-11.)

Subsequent to his testing, Mr. Abhari held a meeting with the Biofining team at Syntroleum on June 27, 2007. (JA3355-56; JA3391-410.) The minutes of that meeting indicate that Mr. Abhari worked in collaboration with the Analytical/Catalyst Laboratory to generate the GC-FID data underlying the

13

discovery described above, that he worked in the catalyst laboratory with Shelly Goodman (Jennifer Parker's manager), and that the Biofining testing included the GC analysis on May 31, 2007, as reflected in Figures 1 and 2 above. (JA3355-56, JA3391-410 at JA3396.)

In addition, the minutes indicate that Dr. Gruver, the author of the Gruver report discussed above, was present at the meeting and "went over results from his recent experiments," including analyzing "the effect of temperature and time on triglyceride (in this case, canola oil) conversion," and stating "these intermediaries further react with hydrogen to produce n-paraffins at higher temperature (>550 F)" and "the pre-sulfided . . . catalyst (leading NiMo candidate), ground and sieved for slurry hydrogenation, was used for the semi-batch reaction." (JA3358-59; JA3395.)

**B.    Intertek's Production of the Claimed Composition**

Having discovered a composition containing a high concentration of at least one even-carbon-number paraffin using a feedstock having naturally-occurring fatty acids and esters, Mr. Abhari began contacting third-party testing laboratories. First, he contacted Intertek PARC ("Intertek") to run a small-scale reactor test using the same GC-FID analysis employed previously for analyzing the resulting product. (JA2649.) Intertek was tasked with identifying and evaluating the catalyst systems and reactor conditions that could produce the discovered composition

14

using a fixed-bed reactor and diluent (as compared to the slurry reactor used in Mr. Abhari's original tests). (*Id.*) Intertek determined that a high even-carbon-number paraffin composition could in fact be produced, and even with a soybean oil-based feedstock, as compared to the canola oil used in Mr. Abhari's original tests. (JA2650.) Mr. Abhari made an entry in his lab notebook, dated February 20, 2008, noting the results of the Intertek tests and indicating the tests were conducted to isolate $C_{18}$- and $C_{12}$-rich n-paraffin compositions. (*Id.*; JA2674.)

In order to investigate the workability of his invention on a larger scale, Mr. Abhari commissioned a pilot-plant test at Intertek in July of 2007. (JA2650-51.) For this test, Mr. Abhari selected a feedstock containing naturally-occurring fatty acids and esters known as the "Tyson Blend"—a blend of various low-value and waste-grade fats, oils, and greases (FOG) from industrial food processing operations. (JA2651.) During the fall of 2007, Mr. Abhari made repeated attempts to get the Intertek pilot started, but was unsuccessful due to delays caused by use of the facility by other customers. (JA2651-53; JA2712-13; JA2714-20.) Not wanting to experience any further delays, Mr. Abhari began seeking alternative testing facilities. (JA2653.)

### C.    SwRI's Pilot-Scale Production of the Claimed Composition and Regular Reporting of Composition Data

On October 19, 2007, Mr. Abhari contacted Katie Boyle, an engineer at Southwest Research Institute ("SwRI") to discuss the possibility of SwRI

15

conducting the pilot-scale test he originally attempted to do at Intertek. (JA2653.)

Mr. Abhari refers to his October 19, 2007 phone call to Ms. Boyle in an email

dated October 19, 2007. (JA2654; JA2721-37.) That email sets forth an overview

of the pilot-plant test procedure, including the feed, feed rate, hydrogen flow rate,

pressure, and temperature to be used in the hydrogenation/hydrogenolysis of the

bio-feedstock. (JA2654; JA2722-23.) An excerpt of this email is shown below:

**From:** Ramin Abhari
**Sent:** Friday, October 19, 2007 11:13 AM
**To:** kboyle@swri.org
**Subject:** Renewable fuel hydrogenation campaign -- request for proposal

Dear Ms. Boyle:

It was a great pleasure talking with you and discussing how we could run our program at SwRI. Please find below an overview of our program.

**Objective:** Convert 1,200 gallons of bio-feedstock to synthetic diesel product using SwRI's large (2 gal/h) fixed-bed hydrogenation unit.

**Sampling and analysis:**
- 1 gas sample per day (every 24 hrs) for CO/CO2/methane/ethane/propane/butanes analysis via GC
- 2-4 liquid product samples per day for specific gravity

- Hydrocarbon product GC analysis (simulated distillation) upon request (estimate about one every other day)

(JA2722-23.) Mr. Abhari emailed Ms. Boyle from November 2007 through March

2008 to coordinate pilot-plant testing. (JA2654.) SwRI began preparing the catalyst

at the plant during the week of February 11, 2008. (JA2656; JA2730.) By March 7,

2008, SwRI had collected samples of the resulting hydrocarbon product, and had

begun testing the undistilled hydrocarbon product using GC-FID analysis.

(JA2657; JA2735-36.)

SwRI's pilot-plant testing occurred from February to June of 2008, during which SWRI collected data on a near daily basis and emailed that data to Mr. Abhari. (JA2658.) In a March 7, 2008 email, Mr. Abhari specifically asks Ms. Boyle when she thought SwRI would begin sending him the liquid product GC analyses. (JA3354; JA2735.) Ms. Boyle replied she would begin sending the gas chromatograms the next day, and indeed the first GC-FID chromatogram from the pilot-scale test was processed and printed on March 9, 2008. (JA3354; JA2735; JA2745-824.)

Mr. Abhari received update emails from SwRI around 2-3 times per week, and the emails typically included status reports and GC-FID analyses of the product produced in the reactor from treating the biological feedstocks. (JA2633; JA2738-44; JA2745-824; JA3411-765.) An exemplary GC-FID test report from March 11, 2008, is shown below:



**Peak results :**

| Index | Name | Time [Min] | Quantity [% Area] | Height [μV] | Area [μV.Min] | Area % [%] |
|---|---|---|---|---|---|---|
| 1 | C5 | 0.27 | 1.11 | 29834.0 | 1930.1 | 1.115 |
| 14 | C8 | 1.55 | 0.06 | 1569.9 | 105.2 | 0.061 |
| 15 | C9 | 2.73 | 0.08 | 1911.6 | 144.2 | 0.083 |
| 16 | C10 | 4.09 | 0.18 | 3952.2 | 310.1 | 0.179 |
| 17 | C11 | 5.47 | 0.26 | 5534.9 | 458.0 | 0.265 |
| 18 | C12 | 6.81 | 0.27 | 5402.8 | 464.4 | 0.268 |
| 19 | UNKNOWN | 8.09 | 0.26 | 5067.3 | 450.2 | 0.260 |
| 2 | C14 | 9.29 | 1.18 | 22459.5 | 2048.3 | 1.183 |
| 3 | C15 | 10.43 | 2.61 | 47820.2 | 4526.5 | 2.614 |
| 4 | C16 | 11.52 | 21.51 | 385809.1 | 37242.7 | 21.508 |
| 5 | UNKNOWN | 12.18 | 0.58 | 3607.1 | 996.7 | 0.576 |
| 6 | C17 | 12.54 | 7.17 | 122000.8 | 12416.2 | 7.170 |
| 7 | UNKNOWN | 13.00 | 0.36 | 6108.0 | 622.3 | 0.359 |
| 8 | UNKNOWN | 13.16 | 2.07 | 21579.0 | 3591.6 | 2.074 |
| 9 | C18 | 13.53 | 56.92 | 945994.3 | 98558.9 | 56.918 |
| 10 | UNKNOWN | 14.08 | 0.39 | 5880.4 | 679.9 | 0.393 |
| 11 | UNKNOWN | 14.45 | 0.42 | 7030.1 | 733.0 | 0.423 |
| 12 | C20 | 15.33 | 0.94 | 14651.2 | 1619.8 | 0.935 |
| 20 | UNKNOWN | 17.00 | 0.19 | 3231.6 | 328.0 | 0.189 |
| 21 | C24 | 18.53 | 0.07 | 1468.1 | 112.7 | 0.065 |
| 22 | UNKNOWN | 21.55 | 0.36 | 3538.6 | 623.0 | 0.360 |
| 13 | UNKNOWN | 32.04 | 3.00 | 7425.9 | 5198.0 | 3.002 |
| Total | | | 100.00 | 1651876.3 | 173159.7 | 100.000 |

(JA2659; JA2745-824 at JA2748.) As seen above, the GC-FID chromatogram shows the peaks already labeled with the corresponding paraffin carbon number (*e.g.*, C16, C17, C18, *etc.*). The GC test report above also shows the presence of a high concentration (*i.e.*, more than 75 wt%) of even-carbon-number paraffins in the liquid product, as expected from the tall peaks at $C_{18}$ and $C_{16}$. As shown in the table accompanying the GC-FID chromatogram in the email from SwRI to Mr. Abhari, the compositions of the even-carbon-number paraffins are as follows: $C_{18}$ (56.918 wt%), $C_{16}$ (21.508 wt%), $C_{14}$ (1.183 wt%), $C_{20}$ (0.935 wt%), $C_{12}$ (0.268 wt%), $C_{10}$ (0.179 wt%), $C_{24}$ (0.065 wt%), and $C_{8}$ (0.061 wt%). By adding these concentrations together, the even-carbon-number paraffin concentration was at

18

least 81.117 wt%. Even if limited to just the $C_{12}$-$C_{24}$ range, the concentration of even-carbon-number paraffins was still 80.877 wt%. These results were obtained utilizing the same nickel molybdenum (NiMo) oxide catalyst as used by Mr. Abhari in his original laboratory test, along with the Tyson Blend feedstock. (JA2661-62; JA3764-65; JA3766.)

Across almost five months of testing at SwRI, the even-carbon-number compositions claimed in the '804 Patent were successfully produced on a nearly constant basis, while using various biological feedstocks. (JA2659-61.) SwRI was able to produce the compositions at 20-40 gallons/day (*i.e.*, pilot-plant scale). (JA2662.) During the testing, Mr. Abhari reviewed the GC test reports for a number of purposes, including studying the product as a potential source of paraffins for PCM applications (*e.g.*, octadecane). (JA2663.)

### D.    Mr. Abhari's Communication with Microtek, a Producer of Phase Change Materials

During the course of the SwRI testing, Mr. Abhari contacted a PCM producer known as Microtek Labs ("Microtek") to discuss testing of the compositions being produced. (JA3370.) Mr. Abhari received an email from Ms. Dawn Mantz, a Microtek employee, on March 6, 2008, confirming that Microtek had received the sample composition that he had sent for testing. (*Id.*; JA3767-68.) An excerpt of the email follows:

Hi Mr. Abhari,

First I wanted to let you know the sample arrived this morning and they are already doing some preliminary testing in the lab with the material.  Thank you for the sample.

You mentioned in your voice message yesterday afternoon that you had some information to send me.  I look forward to receiving it.

I will send you feedback on the material as soon as I receive it.

Best Regards,
Dawn

(JA3767.) Ms. Mantz's email was in response to an email in which Mr. Abhari stated an interest in combining Microtek's PCM experiments with Syntroleum's separate bio-fuel campaign. An excerpt of Mr. Abhari's email is below:

As it turns out, there may be an opportunity to combine your 10,000 kg requirement with a government contracted biofuel campaign around the same mid-2008 timeframe.  We will go ahead then and provide you with an estimate based on the assumption that the 10,000 kg is part of a larger production campaign.

(JA3768; JA3370)

At least as early as one month prior to contacting Microtek, based on a literature search that he conducted, Mr. Abhari appreciated that high-even-carbon-number paraffins were useful as PCMs. (JA3368-69.) He sent a memorandum on February 19, 2008, to Mr. Gary Roth, director and CEO of Syntroleum, communicating his belief that Syntroleum could commercialize the production of high-even-carbon-number paraffins as PCMs. (*Id.*; JA3286-93.) Mr. Abhari thus appreciated that his discovered process' high selectivity toward even-carbon-number paraffins could be used to produce and sell octadecane as a PCM. (JA3368-69; JA1454-60, JA1546-47.)

20

### E.    Mr. Abhari's Involvement in the Construction of a Full-Scale Production Plant To Manufacture the Claimed Composition

The next step for Mr. Abhari was to determine whether his discovery could be produced viably on a commercial scale. At least as early as March 2008, Mr. Abhari was assisting in the design of a production plant in Geismar, Louisiana, which would be used for commercial-scale production of the discovered composition. (JA2664.) The Geismar plant process would build upon the SwRI tests by implementing the process claimed in the '804 Patent with a hydrodeoxygenation/hydrogenolysis reactor system to produce an even-carbon-number paraffin composition useable as a PCM (among other uses). (JA2664-65.)

From March 2008 through August 2009, Mr. Abhari was involved in the design and construction of an HDO reactor at the Geismar plant, which was central to the plant's ability to produce to the claimed compositions. In March 2008, Mr. Abhari's team commissioned a division of Doosan Mecatec Co. to assist with construction. (JA2665; JA2825-50; JA2851-63.) In July 2008, Mr. Abhari's team presented a Fuel Registration Update to the management committee of Dynamic Fuels. (JA2669.) The presentation recommended registering the even-carbon-number compositions claimed in the '804 Patent as an n-paraffin diesel blendstock. (*Id.*; JA2864-65.)

21

Two months later, in September 2008, Mr. Abhari began drafting the patent application that would become the '804 Patent. (JA2670.) Mr. Abhari sent a draft to Syntroleum's patent attorney in late October 2008, who returned drafts on November 18, 2008 and again on December 4, 2008. (*Id.*; JA2866-67.) The patent application, designated Patent Application No. 12/331,906 was filed on December 10, 2008. (JA2670; JA768-806.)

## SUMMARY OF THE ARGUMENT

The Board's anticipation findings with respect to Dindi and Craig were erroneous. ***Dindi***: the Board's determination that REG failed to sufficiently corroborate its inventor's testimony in order to swear behind Dindi was based upon multiple errors of law and fact. First, the Board erred as a matter of law by requiring REG to prove its inventor's recognition and appreciation of the claimed composition as a PCM (which is not a claim limitation), instead of Mr. Abhari's recognition and appreciation of the composition itself and a method of making it, per the Board's claim construction. The Board further erroneously required REG to prove Mr. Abhari's appreciation of the usefulness of a composition whose utility was already widely known in the industry as diesel fuel products and lubricant additives, and thus obvious. Mr. Abhari expressly noted this usefulness in his communications with others.

Second, the Board erred by excluding multiple REG exhibits demonstrating Mr. Abhari's invention of the claimed composition prior to Dindi. Instead of identifying the admissible body of evidence relevant to Mr. Abhari's conception and then determining whether sufficient corroboration existed within that body of evidence under the "rule of reason" (in view of the elevated standard for corroborative evidence), the Board first excluded evidence that could not corroborate under the elevated corroboration standard, and then performed the "rule of reason" analysis based only on the already-culled body of evidence. This inverted analysis was legal error.

Third, the Board abused its discretion by excluding certain evidence relevant to REG's antedation of Dindi as not authenticated or hearsay. The error in these evidentiary determinations relates to the broader flaw in the Board's approach to corroboration. For example, evidence that is adequately authenticated is admissible under the Federal Rules of Evidence, irrespective of whether it can corroborate inventor testimony. Similarly, the Board's analysis focused on conception, which inherently goes to the mental state of the inventor and communications with others. As such, evidence can have significant nonhearsay value in the conception analysis. The Board failed to appreciate these distinctions and erroneously excluded or dismissed exhibits that were admissible and should have been considered, even if not corroborative or for the "truth of the matter asserted."

23

In view of all of the admissible evidence and the purpose for which it should have been considered, REG proved Mr. Abhari invented the claimed composition prior to Dindi, and sufficiently corroborated his invention under the "rule of reason." The Board's determination to the contrary and its resulting anticipation finding as to claims 1-3, 5, and 8 should therefore be reversed, or, alternatively, remanded for further findings in view of all admissible evidence and a proper conception analysis.

*Craig*: The Board's finding that Craig anticipates claims 1, 3, 4, and 8 of the '804 Patent was based on an erroneous inherency standard and insubstantial evidence. Inherency requires that the undisclosed element necessarily be present in the reference, not probably or possibly present—or as the Board wrongly concluded, that it was merely "unlikely" that Craig did not disclose the claimed weight percentages.

Moreover, in reaching this conclusion (which itself is insufficient proof of inherent anticipation as a matter of law), the Board relied on Neste's expert testimony to "fill the gap" in the Craig reference by estimating weight percentages from Craig's disclosed area percentages. However, Neste's expert ignored, and the Board disregarded, the only objective evidence of record discussing the circumstances under which such estimates can be made reliably:  Prior art of record explains that using literature values to calculate weight percentages from

24

area percentages requires calibration to account for actual instrument and operating conditions.

Despite his admission that he performed no such calibration, the Board relied on Neste's expert's uncorrected weight percent estimates to establish inherent anticipation. In doing so, the Board noted the <u>precision</u> of the estimates, yet completely ignored the record evidence warning that such values could not be quantitatively <u>accurate</u>, absent calibration. Thus, there was insubstantial evidence in the record to support the Board's inherency determination and the Board's decision with respect to Craig should be reversed, or remanded to the Board for further findings in view of a proper inherency standard and the record evidence.

## STANDARD OF REVIEW

The issue of anticipation—whether by inherency or otherwise—is a question of fact, and the Court reverses decisions of the Board on factual matters if there is not substantial evidence in the record to support the Board's findings. *Rapoport v. Dement*, 254 F.3d 1053, 1063 (Fed. Cir. 2001). Inappropriate application of the inherency standard is legal error. *See W.L. Gore & Assocs. v. Garlock, Inc.*, 721 F.2d 1540, 1547 (Fed. Cir. 1983).

Issues of conception and reduction to practice are questions of law predicated on subsidiary factual findings. *Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1171 (Fed. Cir. 2006). One such finding is sufficiency of corroboration. *Id.*

25

Whether or not sufficient corroboration exists is a question of fact reviewed for clear error. *Id.*

Evidentiary rulings are reviewed under an abuse of discretion standard. *Chen v. Bouchard*, 347 F.3d 1299, 1307 (Fed. Cir. 2003). Thus, a Board's evidentiary ruling should be overturned if it is clearly unreasonable, arbitrary, or fanciful; based on an erroneous conclusion of law; resting on clearly erroneous fact findings; or follows from a record that contains no evidence on which the Board could rationally base its decision. *Id.*

The Board's interpretations of its rules are accepted unless "plainly erroneous or inconsistent with the regulation." *Koninklijke Philips Elecs. N.V. v. Cardiac Sci. Operating Co.*, 590 F.3d 1326, 1334 (Fed. Cir. 2010).

## ARGUMENT

### I.    The Board Erroneously Found Claims 1-3, 5, and 8 Anticipated By Dindi

The Board's finding that Claims 1-3, 5, and 8 of the '804 Patent are anticipated by Dindi is erroneous, is not supported by substantial evidence, and is based on misapplication of the law. Specifically, the Board erred in defining the scope of REG's invention, excluding admissible evidence, and failing to appropriately apply the "rule of reason" in its conception analysis.

In order to swear behind the Dindi reference, REG offered inventor testimony detailing REG's invention of the claimed composition well prior to

26

Dindi. In addition to the inventor testimony, REG offered independent evidence of the earlier invention. Specifically, the record evidence shows the experimental project Mr. Abhari was working on when the claimed compositions were first produced, and includes the first GC chromatograms measuring the compositions. (JA2643.) The record further shows how Mr. Abhari repeatedly produced the claimed compositions using different biological feedstocks. (JA2647-48; JA2685; JA2686-87; JA2688-705.) To investigate the potential scale-up of the process, Mr. Abhari contracted with an outside operator, SwRI, who set up and ran Mr. Abhari's process at the pilot scale. SwRI operated the process for over four months, and reported results every few days that included GC chromatograms verifying that the claimed compositions were indeed being produced using various feedstocks. (JA3411-763.) Overlapping with the pilot-plant tests, Mr. Abhari contacted at least one potential customer of the claimed compositions, a company that specialized in phase change materials. (JA3767-68.) Finally, Mr. Abhari and REG designed and began the process of building a commercial-scale plant, including the procurement of specialized equipment necessary to make the claimed compositions. (JA2664-69.) The record evidence thus shows conception of the claimed compositions, actual reduction to practice, and, alternatively, diligence through the filing of the patent application.

27

In its decision on Neste's motion to exclude evidence, the Board improperly excluded—as either unauthenticated or hearsay—certain REG exhibits supporting its earlier invention date. As a result, the Board's denial of REG's earlier invention date was erroneous. The correct approach would have been to: (i) identify the entire body of admissible evidence relevant to the date of invention, regardless of corroboration; (ii) identify which of such evidence constituted independent corroboration; and (iii) undertake a "rule of reason" analysis to determine if the evidence of conception was sufficiently corroborated. Here, however, the Board effectively inverted this analysis.

The Board first excluded evidence it found not independently authenticated for corroboration, as well as evidence allegedly having no non-hearsay purpose, and only then evaluated the remaining evidence under a flawed "rule of reason" analysis. Moreover, even if only the evidence found admissible by the Board were considered, the Board's conclusion was still erroneous, as substantial evidence corroborated Mr. Abhari's conception. This Court should reverse, and find that REG proved both conception and reduction to practice of the claimed invention before the filing date of Dindi, thus removing Dindi as prior art to the '804 Patent.

### A.    The Board Erred in Defining the Scope of Invention to Include Use of the Compositions as Phase Change Materials (PCMs)

Before resolving questions of priority, the invention must be properly defined. *Teva Pharm. Indus. v. Astrazeneca Pharms. LP*, 661 F.3d 1378, 1384

28

(Fed. Cir. 2011). Here, in determining whether REG had adequately corroborated Mr. Abhari's conception of the invention, the Board sought corroborating evidence not just that Mr. Abhari appreciated the claimed composition, but that Mr. Abhari appreciated the composition as "something new." (JA16, citing *Invitrogen Corp. v. Clontech Labs., Inc.*, 429 F.3d 1052, 1063-64 (Fed. Cir. 2005).) For this inquiry, the Board focused solely on whether corroborating evidence showed Mr. Abhari's appreciation that the discovered compositions were useful as PCMs. (JA23.) As discussed below, it was legal error for the Board to require REG to prove appreciation of the claimed compositions as PCMs in order to establish conception.

While the phrase "phase change material" appeared in the preamble of the claim 1, the Board previously ruled that the presence of "a phase change material composition" in the preamble merely expressed an intended use and, therefore, was not limiting on claim scope. (JA9; JA133.) As a result, the claims were not distinguished on this basis from any the prior art relied upon by the Board (indeed, neither Dindi nor any of the other cited prior art disclosed using the compositions as PCMs). It is axiomatic that a limitation not considered in comparison to the prior art should likewise not be a part of the conception analysis. *In re Clarke*, 53 C.C.P.A. 954, 961 (C.C.P.A. 1966); *see also Teva Pharm. Indus.*, 661 F.3d at 1384 (holding that the inventor need not conceive of invention in the same terms that were later used to claim it). Thus, the Board's insistence on proof of Mr. Abhari's

29

appreciation of the utility of the discovered compositions as PCMs in order to prove conception was legal error.

### 1.    Conception Only Requires REG To Prove that Mr. Abhari Appreciated the Fact of the Composition He Discovered, not that the Composition Was Patentably "New"

The conception date is the date the inventor first appreciated the fact of what was made. *Dow Chem. Co. v. Astro-Valcour, Inc.*, 267 F.3d 1334, 1341 (Fed. Cir. 2001). Contrary to the Board's analysis (JA16, JA22-24), this Court has expressly held that it is not necessary for the inventor to appreciate that the invention is patentably "new." *Id*.

The inquiry focused on by the Board below stems from this Court's precedent in cases involving "unrecognized accidental duplication." (*See* JA16 (citing *Invitrogen*).) That analysis addresses the situation where an invention exists in fact, but remains unrecognized. *Invitrogen*, 429 F.3d at 1064. A key issue in *Invitrogen* was that the claimed subject matter was directed not to a composition of matter, but to a process for making enzymes having specific properties—namely DNA polymerase activity, but no RNase H activity. *Id*. at 1062. The researchers attempting to prove earlier invention had prepared a panel of 100 mutant enzymes, but were unable to determine at that time whether any of these 100 enzymes had the claimed activity. *Id*. at 1058-59. Indeed, even sequencing the enzymes (*i.e.*, determining their composition) could not be used to establish their activity

30

properties. *Id*. at 1066. Even though it was later determined that two of the enzymes produced in the panel had the claimed activity, the Court found these circumstances to fall squarely within the "unrecognized, accidental duplication" line of precedent requiring an appreciation that "something new" was formed. *Id*. However, similar facts are not present here.

As stated long ago, conception is "the formation in the mind of the inventor of a definite and permanent idea of the complete and operative invention as it is thereafter to be applied in practice . . . ." *Townsend v. Smith*, 36 F.2d 292, 295 (C.C.P.A. 1930). With respect to a <u>chemical substance</u>—the focus of the claims here—conception requires knowledge only of the specific composition, and an operative method of making it. *Burroughs Wellcome Co. v. Barr Labs., Inc.*, 40 F.3d 1223, 1229 (Fed. Cir. 1994).

Thus, commensurate with the claims at issue, REG only needed to prove Mr. Abhari's appreciation of the fact that the claimed composition had been formed, and a process to make it. *Id*.; *Dow Chem.*, 267 F.3d at 1341. As discussed in section I.C below, the record evidence more than satisfies this requirement.

### 2.    The Usefulness of the Claimed Compositions Was Obvious

Not only did the Board err in requiring REG to prove that Mr. Abhari appreciated his compositions as useful for PCMs, in this case, the Board should not have required any proof of usefulness because the claimed paraffin compositions

are obviously useful. As the prior art teaches, these compositions have generally known usefulness as diesel fuels, and/or additives for diesel fuels. (JA644; JA2948-55.)

Where an inventor merely discovers a new form or species of a genus already known to be useful, the usefulness of the newly discovered species is obvious. *Silvestri v. Grant*, 496 F.2d 593, 601 (C.C.P.A. 1974). In *Silvestri*, the inventor discovered not a new drug, but merely a new form of the drug ampicillin. *Id*. Because ampicillin was already known to be useful as an antibiotic, the new form's usefulness was obvious. *Id*.

Here, Mr. Abhari did not discover a new compound, but rather, as in *Silvestri*, a new form of a known compound – in this case a paraffinic composition produced from biological feedstocks. Paraffin compositions (even those from biological sources) were already known to be useful for a variety of purposes, including as fuels and/or additives for fuels. (JA2948-55.) Consistent with this known use was Mr. Abhari's express mention of the production of a "diesel product" in his initial proposal to SwRI. (JA2722-23.)

Thus, the Board committed legal error in requiring REG to prove an appreciation for the claimed compositions as PCMs in the context of establishing an earlier invention date. The Board's approach cannot be sustained when the Board itself ruled that the claims do not include any such PCM limitation, and

32

none of the prior art, including Dindi, was analyzed for such a disclosure. The claimed compositions were known to be useful as diesel fuel products, and the record evidence shows that Mr. Abhari expressly noted this usefulness in his communications with others (namely SwRI), and thus appreciated his composition's usefulness. (*Id.*)

## B. The Board Erred in Refusing to Consider Numerous REG Exhibits Supporting its Invention Date Claim

The Board erred excluding, in whole or part, Exhibits 2003, 2006, 2012, 2013, 2053, 2057, 2061, and 2062.

### 1. Exhibits 2003 and 2006 Should Not Have Been Excluded as Non-Authenticated

The Board's decision to exclude Exhibits 2003 and 2006 confused authentication with corroboration. Authentication requires the proponent of the evidence to provide evidence sufficient to support a finding that the item is what the proponent claims it is. FED. R. EVID. 901(a). The rule provides several examples of evidence that may satisfy the requirement, including testimony of a witness with knowledge that the item is what it is claimed to be. FED. R. EVID. 901(b)(1). REG provided Mr. Abhari's testimony to authenticate Exhibits 2003 and 2006. (JA2634; JA2640-41; JA2645-46.) Mr. Abhari testified as to his personal knowledge of Exhibit 2003 being a report prepared in June 2007 by Dr. Gruver (working under him), summarizing testing leading up to the claimed

33

invention. (JA2640-41.) Mr. Abhari testified that Exhibit 2006 is a spreadsheet prepared as part of a contemporaneous report on GC testing performed by Jennifer Parker. (JA2645-46.) Mr. Abhari is a witness with knowledge that each document is what it is claimed to be.

Despite Mr. Abhari's testimony, the Board ruled that authentication "required more," and that because REG relied on the exhibits as relevant to its conception argument, independent evidence of authenticity was required. (JA545-556 at JA548.) This ruling was an abuse of discretion, and was based on an erroneous conclusion of law. While it is true that independent evidence is required to authenticate a document that is used as corroborative evidence of an earlier invention date, independent evidence is not required for the document to be authenticated under FRE 901(a) in the first instance.

The evidence necessary for corroboration is determined by the "rule of reason," which involves an examination, analysis, and evaluation of the record as a whole to make a reasoned determination as to the credibility of the inventor's story. *Berges v. Gottstein*, 618 F.2d 771, 774-75 (C.C.P.A. 1980); *Mann v. Werner*, 347 F.2d 636, 640 (C.C.P.A. 1965). Thus, not all evidence considered in a priority analysis need be "independent corroborating" evidence. Even if a document cannot be relied upon for corroboration due to lack of independent authentication, the documents may still nonetheless be a part of the record on which the priority

34

analysis is based. *See, e.g.*, *Chen*, 347 F.3d at 1313 ("Not every aspect of an inventor's testimony requires corroboration.").

The Board thus erred in excluding Exhibits 2003 and 2006 altogether, given that they were adequately authenticated under FRE 901 by Mr. Abhari. The Board's decision to exclude these exhibits was based on an erroneous conclusion of law and therefore an abuse of discretion.

### 2.    Exhibits 2012 and 2013 Should Not Have Been Excluded as Hearsay

Exhibits 2012 and 2013 should not have been excluded as hearsay (JA549-50), because they qualify for the business records exception under FRE 803(6). Below, REG argued that these documents (which were updates and reports from SwRI's pilot testing) were business records of REG's regularly conducted research and development activities. (JA362-80 at JA373.) The Board ruled, however, that the out-of-court statements within the documents were those of SwRI staff, and not Mr. Abhari or anyone at Syntroleum/REG. (JA550.) It concluded: "[W]hether the reports were kept in the course of Syntroleum's regular activities, as REG asserts, is beside the point. The relevant question is whether the documents were kept in the course of SwRI's regularly conducted activities; on this point, Mr. Abhari does not testify." (*Id.*) This evidentiary ruling was based on an erroneous conclusion of law and therefore an abuse of discretion.

35

Contrary to the Board's understanding, the business record exception can apply to documents not prepared by REG. The law plainly recognizes that

> Rule 803(6) does not require that the document actually be prepared by the business entity proffering the document. Rather, the cases stress two factors, indicating reliability, that would allow an incorporated document to be admitted based upon the foundation testimony of a witness with first-hand knowledge of the record keeping procedures of the incorporating business, <u>even though the business did not actually prepare the document</u>. The first is that the incorporating business rely upon the accuracy of the document incorporated and the second is that there are circumstances indicating the trustworthiness of the document.

*Air Land Forwarders, Inc. v. U.S.*, 172 F.3d 1338, 1343 (Fed. Cir. 1999) (finding third-party estimates admissible as business records of the military based on the military's reliance on the estimates).

Here, REG provided testimony of a witness with first-hand knowledge of the record-keeping procedures of REG, and demonstrated both reliance on the information and circumstances indicating trustworthiness, particularly as to Exhibit 2013. Mr. Abhari testified that during SwRi's pilot testing, it provided him email status updates, including GC-FID test results, every few days from at least as early as February 12, 2008 to at least as late as June 30, 2008. (JA2658.) Mr. Abhari authenticated a compilation of over 80 GC-FID test reports provided by SwRI dated between March and July of 2008. (*Id.*; JA2745-824; *see also* JA3365; JA3411-763.)

REG demonstrated its reliance on the information in Exhibit 2013 as required by *Air Land Forwarders*. Mr. Abhari testified that he regularly reviewed the SwRI data for catalyst performance data; to validate reactor metallurgy to be used on a commercial scale plant; to evaluate reactor fouling; to analyze 75+ wt% even-carbon-number paraffin product for potential contaminants and hydroisomerization catalyst poisons; to study the HDO product as a potential source of PCM paraffins; and to evaluate the efficiency of isomerizing HDO product for production of diesel. (JA2663.) REG so relied on the SwRI data that in June 2008 it began design and construction of a full-scale commercial production plant in Geismar, Louisiana, to be used for production of the claimed composition. (JA2664.)

The reports also possesses other strong indicia of reliability. In Exhibit 2013, Mr. Abhari provides over 80 of the reports generated in the relevant time period, each one reported in substantially identical form and possessing the characteristics of a GC-FID test report as described by Mr. Abhari and as also generated by Ms. Parker. (*Compare* JA2745, *with* JA2643, JA2685, and JA2688-705.) In addition, the substance of the reports accords with Mr. Abhari's directions to Ms. Boyle in his emailed instructions. (JA2722-23.) Much of the content in the reports is also computer-generated and uneditable, with each graph indicating the system used to perform the test, the person performing the test, and the date and time the data was

37

acquired, processed, and printed. (*See, e.g.*, JA2745.) There is no indication that any of the reports provided by SwRI are untrustworthy, and, as the Board noted, Neste did not challenge the authenticity or veracity of these exhibits, nor did the Board express any doubt over the documents' trustworthiness. (JA549.)

Thus, the SwRI reports, Exhibits 2012 and 2013, should have been exempted from exclusion under the hearsay rule, and the Board's failure to consider them for all purposes was premised on an erroneous conclusion of law and therefore was an abuse of discretion.

### 3.    Exhibit 2062 Has Evidentiary Value Independent of its Truth and Should Have Been Considered for Those Purposes

Exhibit 2062 also should have been considered for its non-hearsay value. REG suggested that the statements in Exhibit 2062 were "at a minimum, admissible for what they describe and are relevant for their corroborative evidentiary value, independent of their truth." (JA377.) Mr. Abhari testified that he was diligent from at least as early as May 31, 2007, when he appreciated the results of the May 31, 2007 GC-FID chromatogram, until constructive reduction to practice on December 10, 2008 (the filing date of the '804 Patent). (JA2635.) Mr. Abhari further testified that Exhibit 2062 is the flow chart describing the activities and deadlines associated with the ongoing Biofining project he was supervising that led to the invention of the '804 Patent. (JA3376-85.) As a result, Exhibit 2062 is relevant to show that, during the time period at issue—from his May 31, 2007

38

discovery through the filing of the application for the '804 Patent—Mr. Abhari believed he was involved in a project involving a host of activities relating to system philosophy development, basic engineering, contractor procurement, and equipment procurement relating to the reduction to practice of the claimed composition. (*Id.*) Thus, regardless of whether anything in Exhibit 2062 were actually true, at a minimum, Mr. Abhari believed he was actively working to further reduce his invention to practice by monitoring and performing the activities listed and described in the project flow chart. *See, e.g.*, *Borror v. Herz*, 666 F.2d 569, 571 ("The inventor's contemporaneous state of mind regarding the invention is an important consideration in reaching a decision regarding reduction to practice, as, for example, with regard to his conviction of success.").

The Board's decision to exclude this exhibit in its entirety was therefore an abuse of discretion. Exhibit 2062 should not have been excluded altogether under the hearsay rule, and the Board's failure to consider it for its nonhearsay purposes was an abuse of discretion.

### 4.     Exhibit 2053 Should Not Have Been Excluded as Improper Reply Evidence

The Board also erred in refusing to consider Exhibit 2053, a memorandum authored by Mr. Abhari. Mr. Abhari sent Exhibit 2053 to Gary Roth, the CEO of Syntroleum, on February 19, 2008, to convey his belief that Syntroleum could commercialize his discovered compositions as a PCM. (JA3286-93.) The Board,

citing 37 C.F.R. § 42.24, and relying on the Trial Practice Guide,[4] concluded that Exhibit 2053 constituted improper reply evidence that "is not linked to rebutting any particular fact or argument set forth by Neste." (JA19.) This conclusion was clearly erroneous in view of the record.

First, while this exhibit could have hypothetically been presented with its response, REG had no reason at that time to introduce evidence solely related to use of the discovered composition as a PCM, particularly when PCM had been determined not to be a claim limitation. (JA133.) Thus, any potential relevance of this exhibit was not apparent at the time of REG's initial response.

Further, directly contrary to the Board's contention, Exhibit 2053 <u>was</u> presented in response to Neste's arguments. In both its Reply, and Opposition to REG's Motion to Amend, Neste expressly argued that Mr. Abhari failed to appreciate the usefulness of even-carbon-number paraffins as PCMs. (*See* JA247, JA249; JA268-70.) In its reply brief, REG specifically noted Neste's argument, and proceeded to point out the evidence that Neste had ignored, including Exhibit 2053, which was expressly cited. (JA241-42.) Thus, REG's reply brief plainly shows the incorrectness of the Board's stated rationale for excluding Exhibit 2053.

Moreover, Mr. Abhari discussed and produced this exhibit at his deposition (which occurred even before Neste's Reply and Opposition were filed), in response

---

[4] *Office Patent Trial Practice Guide*, 77 Fed. Reg. 48,756, 48,767 (Aug. 14, 2012).

40

to Neste's questions about when he first thought of paraffins being useful as PCMs. (JA1466-68.) Later, in his second declaration, Mr. Abhari discussed Exhibit 2053 immediately following his statement that "Neste's argument that this testimony is unsupported by the record evidence is wrong." (JA3368-69.)

In sum, Exhibit 2053 is responsive to arguments raised by Neste— arguments which the Board concluded REG could not have anticipated. (JA20.) REG plainly put forth Exhibit 2053 in response to these arguments, both during Mr. Abhari's deposition (JA1546), and in its reply brief (JA291). Thus, the Board committed plain error in interpreting its rules to conclude that Exhibit 2053 "could have been presented earlier" and was "not linked" to a fact or argument set forth by Neste.

### 5.    Exhibits 2003, 2006, 2012, 2013, 2053, 2057, 2061, and 2062 Should All Have Been Considered Under the Conception Analysis

The Board refused to accord an earlier date of invention to REG's '804 Patent because it concluded that REG failed to prove that Mr. Abhari conceived of the invention of the challenged claims prior to the June 13, 2008 filing date of Dindi. (JA24.) However, as this Court has acknowledged, conception is defined as

> the complete performance of the mental part of the inventive act.… It is therefore the formation, in the mind of the inventor of a definite and permanent idea of the complete and operative invention, as it is thereafter to be applied in practice, that constitutes an available conception, within the patent law.

41

*Coleman v. Dines*, 754 F.2d 353, 359 (Fed. Cir. 1985) (citations and emphasis omitted). *Coleman* further points out that "[c]onception must be proved by corroborating evidence which shows that the inventor <u>disclosed to others</u> his 'completed thought expressed in such clear terms as to enable those skilled in the art' to make the invention." *Id.* (citing *Field v. Knowles*, 183 F.2d 593, 601 (C.C.P.A. 1950) (emphasis added)).

As *Coleman* makes clear, proof of conception need not require documents or other evidence to be assessed for the "truth of the matter asserted" therein; rather, determinations regarding conception focus on the mental part of the inventive act on the part of the inventor (*i.e.*, what the inventor knew and believed), and the disclosure of the invention to others (*i.e.*, communication to others). Thus, the fact of any such communication itself has legal significance, aside from the truth of what was communicated. *Knorr v. Pearson*, 671 F.2d 1368, 1372-73 (C.C.P.A. 1982) ("[T]he question is whether the ideas were communicated, the communication (as opposed to the truth) having legal significance."). Similarly, the mere fact of statements being made, before any controversy over priority arose, can also be used to corroborate the credibility of an inventor's testimony. *Hasselstrom v. McKusick*, 324 F.2d 1013, 1014 (C.C.P.A. 1963) ("The mere fact that those statements, which conform substantially to their testimony, were made before any priority controversy arose, in fact before McKusick filed his

42

application, supports the credibility of that testimony."). Lastly, evidence showing an inventor's overall research program to be consistent with the testimony on conception is likewise relevant to the analysis. *Hybritech Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1376-77 (Fed. Cir. 1986).

As such, the Board abused its discretion refusing to admit and consider the entirety of Exs. 2003, 2006, 2012, 2013, 2053, 2057, 2061, and 2062 for non-hearsay purposes (JA546-53), specifically as to whether they:  (i) showed Mr. Abhari's mental beliefs and knowledge regarding his idea; (ii) contained evidence of a communication of such idea to others; and/or (iii) were consistent with Mr. Abhari's direct testimony and sufficiently removed from any priority dispute to add corroborative value.

Thus, for example, Exhibit 2003 should have been considered by the Board for its non-hearsay value. Mr. Abhari testified that in 2007 one of his projects was to develop a small scale reactor testing procedures in order to develop a method for an activity measurement of deactivated Biofining catalysts. (JA2647-49.) It was this work that produced the experimental procedures and test results (including the GC-FID chromatograms) that ultimately resulted in the claimed compositions having high amounts of even-carbon number paraffins. (JA2641.) Exhibit 2003 is relevant in showing the experimental procedures, process steps, and resulting end-product that Mr. Abhari <u>believed</u> was the basis for his inventive idea. In other

43

words, regardless of whether anything in Exhibit 2003 were actually true, at a minimum, Mr. Abhari understood and believed this to be the process and resulting product that resulted from his on-going project at that time. Furthermore, while Exhibit 2003 may not be "corroboration" evidence in the context of a conception analysis, it nonetheless serves to corroborate Mr. Abhari's testimony by virtue of being consistent with Mr. Abhari's testimony, thereby bolstering Mr. Abhari's testimony in general. *Hasselstrom*, 324 F.2d at 1014; *Hybritech*, 802 F.2d at 1376-77.

Exhibit 2006 also should have been considered for its non-hearsay value. Mr. Abhari testified that he oversaw testing performed by Ms. Parker in May of 2007 which resulted in hydrocarbon compositions with very high concentrations of even-carbon-number paraffins. (JA2644.) He further testified that the data collected in that test was logged in a spreadsheet submitted as Exhibit 2006. (JA2645.) Because Exhibit 2006 shows a composition having an even-carbon-numbered paraffin concentration of over 80% (C18 = 81%, C16 = 4.2%), this exhibit has non-hearsay relevance for showing Mr. Abhari's mental impressions. Whether "true" or not, it shows the basis for Mr. Abhari's belief that he could use hydrogenation/hydrogenolysis of a biological feedstock to form a hydrocarbon composition with concentrations of even-carbon-number paraffins above 80%. Moreover, the data in Exhibit 2006 substantially conforms with Dr. Gruver's report

44

(JA2675-84), Ms. Parker's GC-FID chromatogram (JA2685), and Mr. Abhari's own testimony (JA2639-49), thus showing consistency amongst the evidence and providing corroboration value to the analysis of the record as a whole. *Hasselstrom*, 324 F.2d at 1014.

Exhibits 2012 and 2013 also should have been considered for their non-hearsay value. Mr. Abhari testified extensively about the pilot-plant testing he coordinated with SwRI following the successful tests performed in REG's catalytic laboratory. (*See* JA2653-62.) Exhibit 2012 was a copy of the status report provided by SwRI on April 1, 2008, "which describes the particular steps taken by SwRI relating to the pilot plant test on that date." (JA2658.) Mr. Abhari explained that Exhibit 2013 was a compilation of eighty GC-FID reports provided by SwRI dated between March and July of 2008. (*Id.*) Exhibits 2012 and 2013 were not challenged on authenticity grounds, and regardless of their "truth," are relevant to corroborate Mr. Abhari's testimony and belief that he could use hydrogenation/hydrogenolysis of a biological feedstock to form hydrocarbon compositions with very high concentrations (*i.e.*, >80%) of even-carbon-number paraffins. *Hybritech*, 802 F.2d at 1376-77.

Moreover, these documents provide evidence that details surrounding Mr. Abhari's conceived-of invention had been underlined communicated to personnel at SwRI sufficiently such that SwRI could reproduce the production process devised by Mr.

Abhari (JA2738-44), and obtain end-product meeting the limitations of the claims (*i.e.*, even-carbon-numbered paraffin concentration of over 80%). (*See, e.g.*, JA274.) At a minimum, both Mr. Abhari and SwRI believed this to be the case, which is all that conception requires.

Exhibit 2057 also should have been considered for its non-hearsay value. Mr. Abhari testified that he oversaw the Biofining testing performed by Ms. Parker that generated the May 31, 2007 GC-FID chromatogram. (JA2640, JA2645.) He further testified that Exhibit 2057 is meeting minutes from a Biofining team meeting held on June 27, 2007. (JA3355-56.) The minutes include discussion of the GC testing from May and June 2007. (JA3396.) Exhibit 2057 is relevant to show that Mr. Abhari believed he collaborated with the Analytical/Catalyst Laboratory during the relevant time period, believed that his collaboration included supervision of Ms. Parker, and believed the procedures involved in forming the claimed composition were as summarized by Dr. Gruver during the meeting.

The minutes indicate that during the meeting Dr. Gruver "went over results from his recent experiments," which involved analyzing "the effect of temperature and time on triglyceride (in this case, canola oil) conversion" and noting that "these intermediaries further react with hydrogen to produce n-paraffins at higher temperature (>550 F) and that "the presulfided . . . catalyst (leading NiMo cat candidate), ground and sieved for slurry hydrogenation, was used for the

46

semi-batch reaction." (JA3395.) This summary of the Biofining test procedures substantially conforms with the procedures described in Exhibit 2003. Thus, regardless of whether anything in Exhibit 2057 were actually true, at a minimum, Mr. Abhari believed that his Biofining team was following the procedures outlined in Exhibit 2003 (Dr. Gruver's report), and these procedures are those later conveyed to SwRI for the pilot-scale testing (JA2722-23). *See Hybritech*, 802 F.2d at 1376-77.

With respect to Exhibit 2061, Mr. Abhari testified that he studied the GC-FID reports provided by the SwRI pilot to determine if the resulting product would serve as a potential source of PCM paraffins. (JA2663.) He further testified that he understood that high even-carbon-number paraffins were useful as PCMs as early as March 2008, during the time he was receiving the GC-FID reports from the SwRI pilot. (JA3370.) Mr. Abhari testified that Exhibit 2061 is an email he received on March 6, 2008 from Dawn Mantz, an employee of Microtek Labs—a company specializing in PCM technology and a provider of thermal performance products. (*Id.*) Exhibit 2061 is relevant to show that Mr. Abhari believed that high even-carbon-number paraffins could be useful as PCMs. Mr. Abhari testified that if he did not appreciate the high even-carbon-number paraffin's usefulness as a PCM, he would have no reason to contact Microtek to discuss the ongoing testing of his composition. (*Id.*) Thus, regardless of whether anything in Exhibit 2061 were

47

actually true, at a minimum, Mr. Abhari believed that his composition could be useful as a PCM at least as early as March 2008, the date of his communication with Microtek, and the Board should have considered this exhibit in its entirety for that purpose, instead of admitting it for the limited purpose of showing that Mr. Abhari contacted Microtek (*see* JA552).

Exhibit 2062 also should have been considered for its non-hearsay value. Mr. Abhari testified that he was diligent in reducing his invention to practice. (JA2635.) Specifically, he testified that he was diligent from at least as early as May 31, 2007, when he appreciated the results of the May 31, 2007 GC-FID chromatogram, until constructive reduction to practice on December 10, 2008 (the filing date of the '804 Patent). (*Id.*) Mr. Abhari testified that Exhibit 2062 is the flow chart describing the activities and deadlines associated with the ongoing Biofining project he was supervising that led to the invention of the '804 Patent. (JA3376-85.) Exhibit 2062 is relevant to show that, during the time period at issue—from his May 31, 2007 discovery through the filing of the application for the '804 Patent—Mr. Abhari believed he was involved in a project involving a host of activities relating to system philosophy development, basic engineering, contractor procurement, and equipment procurement relating to the reduction to practice of the claimed composition. (*Id.*) Thus, regardless of whether anything in Exhibit 2062 were actually true, at a minimum, Mr. Abhari believed he was

48

actively working to further reduce his invention to practice by monitoring and performing the activities listed and described in the project flow chart. *See, e.g.*, *Borror*, 666 F.2d at 571.

### C. The Board Erred in Failing To Find an Earlier Conception by Mr. Abhari that Predated Dindi

Conception is the "formation in the mind of the inventor, of a definite and permanent idea of the complete and operative invention, as it is hereafter to be applied in practice." *Hybritech*, 802 F.2d at 1376. Corroboration of conception is required to show that the inventor disclosed his invention to others such that those skilled in the art can practice it. *Coleman*, 754 F.2d at 359. The purpose of the rule requiring corroboration is to prevent fraud and to establish, by proof that is unlikely to have been fabricated or falsified, that the inventor conceived of and successfully reduced his invention to practice. *Berry v. Webb*, 412 F.2d 261, 267 (C.C.P.A. 1969). The evidence necessary for corroboration is determined by the rule of reason, which involves an examination, analysis, and evaluation of the record as a whole to the end that a reasoned determination as to the credibility of the inventor's story may be reached. *Berges*, 618 F.2d at 774-75; *Mann*, 347 F.2d at 640.

Here, Mr. Abhari testifies at length regarding the details of his invention, and his conception prior to Dindi. The record evidence sets forth an abundance of corroborating evidence showing the credibility of Mr. Abhari's testimony, and

49

proving beyond a doubt that Mr. Abhari's testimony is not fabricated or falsified. Despite Neste's ability to cross-examine Mr. Abhari and otherwise test the evidence submitted by REG, Neste failed to even raise a hint of impropriety or inconsistency in the evidence submitted. Under a reasoned review of the record evidence, the Board clearly erred in failing to find corroborated conception of the invention prior to Dindi, and this finding should be reversed. *Hybritech*, 802 F.2d at 1376-78.

### 1.    Even the Evidence Found Admissible by the Board Sufficiently Corroborates Mr. Abhari's Conception of the Invention

While REG disputes the Board's evidentiary rulings excluding certain exhibits, even the evidence analyzed by the Board is sufficient to corroborate Mr. Abhari's testimony regarding conception. First, Exhibit 2004 shows the GC-FID chromatogram dated May 31, 2007, that led Mr. Abhari to first appreciate the composition he had made, namely one containing a high level of even-carbon-numbered paraffins (especially $C_{18}$). (*See* JA2685.) Exhibit 2007 shows 18 more GC-FID chromatograms showing the same results from further testing conducted between June and August of 2007. (*See* JA2688-705.) None of this evidence was objected to on authenticity or hearsay grounds, and thus serves as corroborating evidence for both conception and reduction to practice. *Cf.*

50

*Meitzner v. Corte*, 537 F.2d 524, 529 (C.C.P.A. 1976) (considering evidence as satisfying corroboration requirement where authenticity was not challenged).

Next, Mr. Abhari undertook a validation of his process through pilot-scale testing with an outside vendor, SwRI. Mr. Abhari provided details of the process to SwRI for producing a "synthetic diesel product," including how to set-up the process, the feedstocks to be used, and the conditions under which the process was to be carried out. (JA2639-49; JA2721-22.) Mr. Abhari's correspondence further specified the product testing he wished to see to validate the results, which testing included regular GC analyses for observing the product's composition. (JA2722.) Exhibit 2011 shows that by around March of 2008, the process was up and running at SwRI. (JA2736.)

Finally, the subsequent correspondence between SwRI and Mr. Abhari shows SwRI's successful operation of the process, and appreciation of a resulting product meeting the claim limitations. Specifically, Exhibit 2058 shows both correspondence and obtained data from the pilot-testing campaign from approximately March to July of 2008. On the first page of this exhibit, Ms. Katie Boyle of SwRI acknowledges that the first product samples from processing the biological feedstock contained 98% C14-C18, and 91-92% C14-C18. (JA3411.) Ms. Boyle's email further reports the results of the initial GC-FID analysis, showing an even-carbon-number paraffin concentration of above 80% (C12 =

51

0.268%; C14 = 1.183%; C16 = 21.508%; C18 = 56.918%; C20 = 0.935%; sum = 80.812%). (JA3416.)

Over the course of the nearly 5-month campaign, Mr. Abhari requested and SwRI provided nearly weekly status updates, which included regular reporting of the GC-FID results showing the composition of the product. In all, nearly 80 GC-FID chromatograms and data sets were provided from SwRI to Mr. Abhari showing the high even-carbon-number concentration of the product obtained. (*See, e.g.*, JA3424-27.)

Moreover, the staff at SwRI understood the even-carbon-number concentration to be an important measure of product quality, noting in an email dated April 2, 2008, that in the tested product, "C16 is about 22%, C17 is about 11%, and C18 is about 55%." (JA3443.) Thus, this particular correspondence referenced a product having 77 wt% of C16 and C18 alone, both of which are even-carbon-numbered paraffins.

To establish conception, REG only needed to prove that Mr. Abhari appreciated the composition that he had discovered, and that he had conveyed this sufficiently to others such that one of skill in the art could make it. Mr. Abhari initially discovered the claimed composition during his in-house research efforts, and became aware of the composition by virtue of the GC-FID chromatogram he reviewed. He then set up a pilot-scale test where an outside vendor, SwRI,

52

reproduced the process called for in the claims, and routinely monitored and reported GC-FID results confirming that the claimed compositions were obtained. (JA2653-62.)

Conception is clearly established under the record considered by the Board below, because Mr. Abhari had knowledge of both the specific composition of what he produced, as well as an operative method of making it. *Burroughs Wellcome*, 40 F.3d at 1229. Whether Mr. Abhari appreciated his compositions as "patentably new" is irrelevant. *Dow Chem.*, 267 F.3d at 1341. Exhibits 2004, 2007, 2011, and 2058 are independent, corroborative evidence (not challenged as either hearsay or on authentication grounds) showing the fact of Mr. Abhari's communication of his knowledge to others such that they could, and did, reproduce the composition later claimed. Analyzing this evidence under the proper "rule of reason" standard, the evidence considered by the Board sufficiently corroborates Mr. Abhari's testimony regarding his conception of the claimed invention.

### 2.    The Evidence Improperly Excluded by the Board Further Corroborates Mr. Abhari's Conception

Exhibits 2003, 2006, 2012, 2013, 2053, 2057, 2061, and 2062 further corroborate Mr. Abhari's conception. For example, Exhibit 2003 corroborates the experimental procedures, process steps, and resulting end-product that Mr. Abhari testified was the basis for his inventive idea. (JA2675-84.) Exhibit 2003 summarizes this testing and presents numerous GC-FID chromatograms with

53

machine-generated date stamps during the relevant time period, both of which substantially conform to his testimony. (*Id.*) Describing one such chromatogram, the report states: "the chromatogram of the canola oil that served as feedstock contains the family of peaks grouped around of dominant band with retention time ~27 min, which belong to C18 oleic TG." (JA2676.) While not independently authenticated, this exhibit nonetheless bolsters the credibility of Mr. Abhari's testimony by providing an account of the experiments leading up to the discovered composition. (JA2675-84.)

Exhibit 2006 corroborates Mr. Abhari's appreciation of the resulting composition as containing a high amount of even-carbon-number paraffins as of May 31, 2007. Mr. Abhari testifies that Exhibit 2006 reflects the raw data underlying the GC-FID graph of Exhibit 2004 (JA2645), which, as discussed previously, shows the GC-FID chromatogram dated May 31, 2007 that led Mr. Abhari to first appreciate the composition he had made. The data of Exhibit 2006 substantially conforms to Mr. Abhari's testimony regarding his analysis of the GC-FID data during the month of May and, specifically, the May 31 data reflected in Exhibit 2004.

Exhibit 2012 corroborates Mr. Abhari's testimony regarding his communication of the method for making claimed composition to SwRI—the third-party responsible for performing Mr. Abhari's pilot tests. (*See* JA2653-62.)

54

Exhibit 2012 is from April 2008 and contains descriptions of hourly activities related to the ongoing pilot testing at the SwRI facility at that time. (JA2738-44.) Exhibit 2012 thus corroborates Mr. Abhari's testimony that he contacted SwRI to perform pilot testing, and, at a minimum communicated process and test procedures, expectations regarding the resulting composition, and the taking of samples for subsequent testing.

Exhibit 2013 corroborates Mr. Abhari's testimony regarding the pilot-plant testing he coordinated with SwRI following the successful tests performed in REG's catalytic laboratory. (*See* JA2658.) Exhibit 2013 is a compilation of eighty GC-FID reports provided by SwRI dated between February 6 and July 7, 2008, that corroborate Mr. Abhari's belief that he could form hydrocarbon compositions with very high concentrations (*i.e.*, >80%) of even-carbon-number paraffins. Exhibit 2013 also corroborates that Mr. Abhari communicated to SwRI sufficiently such that SwRI could obtain a product meeting the limitations of the claims (*i.e.*, an even-carbon-numbered paraffin concentration of over 80%).

While REG believes it should not have had to prove Mr. Abhari's appreciation of the usefulness of the claimed compositions as a PCM, Exhibit 2053 corroborates Mr. Abhari's testimony that he appreciated the utility of his composition as a PCM not later than February 19, 2008. (JA3368-69.) Exhibit 2053 is a memorandum authored by Mr. Abhari detailing his belief that his

55

discovered composition could be useful as a PCM. (JA3286-93.) In it, Mr. Abhari also references his contact with Ms. Mantz at Microtek, thus conforming to other record evidence corroborating Mr. Abhari's communicated belief he could use his composition as a PCM. (JA3767-68.)

Exhibit 2057 corroborates Mr. Abhari's testimony regarding the experimentation that led to his May 2007 discovery. Exhibit 2057 is Biofining team meeting minutes, which indicate that during the meeting Dr. Gruver went over results from his recent experiments, the description of which substantially conforms to the description of procedures outlined in Dr. Gruver's report, Exhibit 2003. This corroborates Mr. Abhari's testimony that he believed the procedures described in Exhibit 2003 and Exhibit 2057 could be followed to obtain a product containing high even-carbon-number paraffins.

Again, although not required, Exhibit 2061 corroborates Mr. Abhari's testimony that he studied the GC-FID reports provided by the SwRI pilot to determine if the resulting product could serve as a PCM, and that he understood that high even-carbon-number paraffins were useful as PCMs as early as March 2008. (JA2663; JA3370.) Exhibit 2061 is an email Mr. Abhari received on March 6, 2008 from Dawn Mantz, an employee of Microtek Labs—a company specializing in PCM technology and a provider of thermal performance products.

(*Id.*) Exhibit 2061 corroborates Mr. Abhari belief that high even-carbon-number paraffins could be useful as PCMs.

Exhibit 2062 corroborates Mr. Abhari's testimony that he was diligent from at least as early as May 31, 2007 until constructive reduction to practice on December 10, 2008 (the filing date of the '804 Patent). (JA2635.) Exhibit 2062 is the flow-chart describing the activities and deadlines associated with the ongoing Biofining project Mr. Abhari was supervising that led to the invention of the '804 Patent. (JA3376-85.) Exhibit 2062 corroborates Mr. Abhari's testimony that he believed that during the time period at issue, from his May 2007 discovery through the filing of the application for the '804 Patent, he was involved in a project involving a host of activities relating to system philosophy development, basic engineering, contractor procurement, and equipment procurement relating to the reduction to practice of the claimed composition. *See, e.g.*, *Borror*, 666 F.2d at 571.

### 3.    The Record Evidence Establishes a Reduction to Practice

Although the Board did not reach this question below, the record evidence likewise establishes a reduction to practice. For example, Exhibit 2004 is the first GC-FID chromatogram showing the production of the claimed composition. (JA2685.)   Exhibit 2007 provides 18 more GC-FID chromatograms showing achievement of the claimed composition. (JA2688-705.) Exhibit 2011 shows Mr.

Abhari's conveyance of the process details to SwRI for their pilot-scale experiment to produce the "synthetic diesel product." (JA2721-37.) And finally, Exhibit 2058 shows the results of that pilot-scale campaign over more than four months, with SwRI regularly reporting GC-FID chromatograms showing that it was able to in fact follow Mr. Abhari's process, and obtained the claimed composition using a variety of feedstocks. (JA3411-763.) These SwRI results prove reduction to practice.

As noted above in section I.A.2, the discovered compositions had obvious utility as specialty chemicals and intermediates, lubricant/wax additives, and as diesel fuel or diesel fuel cetane-enhancers. Thus, it is not necessary for REG to prove that Mr. Abhari appreciated the compositions as being useful for PCMs (although, as discussed in the previous section, such appreciation is also manifest from the record).

In sum, REG proved both conception and reduction to practice of the claimed compositions, complete with corroborating evidence of same, well before Dindi's July 2008 filing date. Dindi should therefore be removed as prior art, and the Board's finding of claims 1-3, 5, and 8 as anticipated by Dindi should be reversed. At a minimum, the Board's decision should be vacated for further consideration by the Board based on the correct evidentiary record and legal standards.

58

## II.    The Board Erroneously Found Claims 1, 3, 4 and 8 Anticipated by Craig

The Board erred in finding that claims 1, 3, 4 and 8 of the '804 Patent are inherently anticipated by Craig. The standard for inherency imposes a high burden to show that a missing element of the claims is necessarily present in the alleged anticipating reference. The Board found that the GC-MS <u>peak area</u> percentages listed in Table 9 of Craig <u>likely</u> disclose compositions meeting the claimed 75 <u>weight percent</u> even-carbon-number paraffins limitation in the claims—which constitutes an improper finding of inherency based on a mere probability or possibility.

Further, in making that finding, the Board impermissibly credited uncorroborated expert testimony that is directly contradicted by objective record evidence published by disinterested third parties. That uncredited testimony was the sole basis for the Board's inadequate conclusion that it is merely "unlikely" that Table 9 does not disclose the claimed composition. Thus, the Board's decision with respect to Craig applied an inappropriate inherency standard, is not supported by substantial evidence, and should be reversed.

### A.    The Board's Analysis Was Grounded in Inherency

To anticipate a claim, a single reference must expressly or inherently disclose each claim limitation. *Finnigan Corp. v. International Trade Commission*, 180 F.3d 1354, 1365 (Fed. Cir. 1999). By acknowledging that Craig does not

expressly disclose compositions including 75 <u>wt%</u> even-carbon-number paraffins, the Board's anticipation determination was based on inherency. (JA29.)

Craig describes hydroprocessing various vegetable oils to produce hydrocarbons in the diesel boiling range. (JA644.) Table 9 of Craig, the basis for the Board's anticipation finding, shows the results of GC-MS (gas chromatography-mass spectrometry) analyses of the hydrocarbon distribution in several hydroprocessed products. (JA649-50.) However, rather than the weight percentages as specified in claims of the '804 Patent, the GC-MS results in Craig are expressed as <u>peak area</u> percentages. (*Id.*) For example, the product derived from Green Seed Canola Oil has 1.88 area% C15, 5.14 area% C16, 22.98 area% C17, *etc.* In commenting that Neste conceded that the area percentages of Table 9 are not the same measure as the weight percentages of the claims, the Board recognized that Craig did not expressly teach weight percentages. (JA29.) Furthermore, the Board expressly rejected Neste's expert's unsupported assertion that GC-MS peak area percentages are roughly equivalent to weight percentages. (JA30.) Given this determination, it is clear the Board did not find Craig to expressly teach compositions comprising 75 wt% even-carbon-number paraffins, but instead applied a (flawed) inherency analysis in reaching its conclusion.

## B.    The Board's Inherency Analysis Applied an Incorrect Standard

When a claim element is missing from a reference, extrinsic evidence may be used to show that the missing element is inherently present. *Cont'l Can Co. v. Monsanto Co.*, 948 F.2d 1264, 1268 (Fed. Cir. 1991). Thus, for example, when a person skilled in the art is relied on to close a gap in the reference, this Court has understood that to be reliance on inherency. *Finnigan*, 180 F.3d at 1365. However, a heightened standard is applied to such evidence. Namely, the "evidence must make clear that the missing descriptive matter is necessarily present in the thing described in the reference, and that it would be so recognized by persons of ordinary skill." *Cont'l Can*, 948 F.2d at 1268. Inherency, however, may not be established by probabilities or possibilities. *Id.* at 1269. The mere fact that a certain thing <u>may</u> result from a given set of circumstances is not sufficient. *Id.*

Here, the Board relied on calculations by Dr. Klein purporting to show the use of relative response factors to estimate weight percentages from reported area percentages. (JA31-32.) As such, the Board relied on a person of skill in the art, Dr. Klein, to demonstrate the presence of a missing element under a theory of inherency. However, instead of determining that Craig's Table 9 must necessarily show the claimed weight percentages of even-carbon-numbered paraffins, the Board accepted a lesser standard in finding inherency. Specifically, after citing to Dr. Klein's calculations, the Board reasoned that it was "**<u>unlikely</u>** that any

61

variations and corrections required by the experimental conditions would result in a weight percentage [of paraffins] being 7% lower than [the 82% value for Canola Premium] reported by Dr. Klein." (*Id.* (emphasis added).)

However, "unlikely" is not the standard for finding inherency; rather inherency can only be predicated on a finding that the missing subject matter must necessarily be present in the cited reference. *See, e.g.*, *W.L. Gore & Assocs.*, 721 F.2d at 1554 ("Anticipation of inventions set forth in product claims cannot be predicated on mere conjecture respecting the characteristics of products that might result from the practice of processes disclosed in references."); *see also Sanofi-Synthelabo v. Apotex, Inc.*, 550 F.3d 1075, 1083 (Fed. Cir. 2008) (same); *In re Arkley*, 455 F.2d 586, 588-89 (C.C.P.A. 1972) (same). The less-than-certain hedging apparent in the Board's decision here cannot satisfy the well-established inherency standard.

Moreover, the Board itself recognized the uncertainty in converting GC-MS peak area percentages to weight percentages when it refused to find that Craig met claim 2's requirement of at least 80 wt% even-carbon-number paraffins (JA32), even though the evidence presented (*i.e.*, that Craig allegedly disclosed a composition with 82 wt% even-carbon-numbered paraffins) was identical as to claim 2 (JA1314-17; JA649-50). Thus, even the Board was not convinced that Craig "necessarily" disclosed compositions having the even-carbon-number

62

paraffin concentration alleged by Dr. Klein, and its finding of anticipation based on inherency under such circumstances was legal and factual error.

### C.    Substantial Evidence Does Not Support the Board's Conclusion, as All Objective Evidence Contradicts the Board's Position

The Board compounded the error in its inherency analysis by further ignoring: (1) the undisputed fact that Craig does not disclose a relative response factor, the identity of the machine or detector, or any other conditions under which the peak area percentages of Table 9 were determined; (2) record evidence in the form of publications by disinterested third parties showing that when applying relative response factors from the literature to calculate weight percentage estimates <u>quantitatively</u>, correction factors must be used to take into account the machine, detector, and conditions used; and (3) the undisputed fact that Dr. Klein did not apply any such correction factors.

Exhibit 2023 ("Göröcs"), relied upon by REG's expert Dr. Lamb in his criticism of Neste's expert's interpretation of Table 9 (JA2868-938 at JA2895-96), states that when relative molar response (RMR) factors are used for quantitative analyses in lieu of actual calibration data, such "literature values <u>will always need some correction</u> due to different experimental conditions and instrumentation. The type of analyzer is only one parameter; ion source temperature; event scan time mass range and gas chromatographic setting may affect the values." (*See* JA2956-

63 at JA2958 (emphasis added).) "These differences focus attention on the importance of experimental parameters." (*Id.*)

Similarly, Exhibit 2024 ("Chaurasia"), also relied upon by REG's expert (JA2868-938 at JA2895-96), states that RMR factors may be used in instances where exact standards are available, "provided that appropriate homologs are used to determine the slope and linear range of the correlation for the instrument and operating conditions used." (JA2964-68 at JA2967.) Thus, both Görocs and Chaurasia instruct that while RMR calculations may be used in certain circumstances, actual instrument and operating conditions are required to ensure accuracy.

In its analysis, the Board relied on three sets of relative response factor calculations by Dr. Klein solely due to their "modest" variation in results. (JA32.) Yet "precision" is no substitute for "accuracy." Importantly, there is no record evidence whatsoever establishing that any of Dr. Klein's calculations were accurate, as opposed to "precise." For example, Dr. Klein did not provide any evidence that any of the response factors he utilized were appropriate to the unknown instrument and operating conditions used by Craig. (*See* JA3924; JA2895-96.) Indeed, the Görocs and Chaurasia references expressly teach against Dr. Klein's approach. (JA2958; JA2967; JA2894-96.) Specifically, each reference teaches that whenever the correction factors reported therein are to be applied to

64

data from another machine/experiment, correction **must** be undertaken to ensure accurate quantitative results. (JA2958; JA2967.) Dr. Klein plainly admitted he undertook no such correction, doing exactly what Göröcs and Chaurasia said should not and could not be done in a quantitative analysis. (*See* JA3924; JA2895-96.)

Dindi further supports the teachings of Göröcs and Chaurasia. For example, Dindi specifically teaches that for <u>quantitative</u> analyses, GC mass-spec data (*i.e.*, such as that reported in Craig) is not used. Instead, GC-FID data is used to determine quantitative weight percentages. (JA656.) This also happens to be the approach followed by Mr. Abhari here, who similarly used GC-FID data to determine weight percentages for his experiments (which was well before this dispute arose). (JA2639-46.)

Thus, all of the objective evidence of record consistently teaches that one cannot use area percentages from GC mass-spec data to accurately calculate weight percentages, and certainly not without applying a correction to the data to account for differences in instrument and operating conditions.

Despite the teaching of Göröcs, Chaurasia, and Dindi, the Board credited the testimony of Dr. Klein on the question of whether Craig discloses the claimed weight percentages. However, expert testimony contradicting the plain language of the reference does not create a factual issue. *MEHL/Biophile Int'l Corp. v.*

*Milgraum*, 192 F.3d 1362, 1367 (Fed. Cir. 1999). Because Dr. Klein ignored the prior arts' express teachings requiring the correction of results obtained through use of response factors to obtain reliable quantitative data, his testimony falls short of the "substantial evidence" required to uphold the Board's inherent anticipation finding.

Because the Board erroneously substituted a lower standard for determining whether 75 wt% even-carbon-number paraffins are inherently present in Craig, and because it ignored record evidence of publications by disinterested third parties showing that Klein's relative response factor calculations were technically unsound, the Board's finding of inherent anticipation of claims 1, 3, 4 and 8 by Craig was legal error, lacks substantial evidence, and should be reversed.

## CONCLUSION

REG respectfully asks the Court to reverse the Board's decisions with respect to its conception analysis as to Dindi, and its inherency finding as to Craig. Alternatively, the Board's decisions should at least be vacated and remanded for further proceedings in view of all admissible evidence and under the correct legal standards.

4830-5985-6423.

Date: September 23, 2015              Respectfully Submitted,

                                     /s/ Jeanne M. Gills
                                     Jeanne M. Gills
                                     Michael R. Houston
                                     FOLEY & LARDNER LLP
                                     321 North Clark Street, Suite 2800
                                     Chicago, Illinois 60654
                                     (312) 832-4500

                                     *Attorneys for Appellant,*
                                     *REG Synthetic Fuels, LLC*

4830-5985-6423.

# ADDENDUM

# TABLE OF CONTENTS

Page

FINAL WRITTEN DECISION                                    JA1-38

U.S. PATENT NO. 8,321,804                              JA39-53

Trials@uspto.gov
571-272-7822

Paper 54
Date:  March 12, 2015

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

NESTE OIL OYJ,
Petitioner,

v.

REG SYNTHETIC FUELS, LLC,
Patent Owner.
_____

Case IPR2013-00578
Patent No. 8,231,804
_____

Before RAMA G. ELLURU, SHERIDAN K. SNEDDEN, and
CHRISTOPHER L. CRUMBLEY, *Administrative Patent Judges.*

CRUMBLEY, *Administrative Patent Judge.*

FINAL WRITTEN DECISION
*35 U.S.C. § 318 and 37 C.F.R. § 42.73*

IPR2013-00578
Patent No. 8,231,804

## I.    BACKGROUND

On September 20, 2013, Neste Oil Oyj ("Neste") filed an Amended
Petition (Paper 5, "Pet.") requesting *inter partes* review of claims 1–5 and 8
of U.S. Patent No. 8,231,804 (Ex. 1033, "the '804 patent").  The owner of
the '804 patent, REG Synthetic Fuels, LLC[1] ("REG"), expressly waived the
filing of a Patent Owner's Preliminary Response.  Paper 9.  In a March 13,
2014, Decision to Institute (Paper 10, "Dec."), we instituted trial on claims
1–5 and 8 based on the following grounds:

1. Whether claims 1–4 and 8 are unpatentable under 35 U.S.C. § 102
   as anticipated by Craig[2];

2. Whether claims 1–3, 5 and 8 are unpatentable under 35 U.S.C.
   § 102 as anticipated by Dindi[3];

3. Whether claims 1–3 and 8 are unpatentable under 35 U.S.C. § 102
   as anticipated by Kubíčka[4]; and

---

[1] On June 24, 2014, REG Synthetic Fuels, LLC filed updated Mandatory
Notices informing the Board that it had acquired Syntroleum Corporation,
the originally-named Patent Owner in this proceeding.  Paper 21.  REG also
informed the Board that it had filed with the Office a Power of Attorney for
U.S. Patent No. 8,231,804, retaining the same counsel that previously
represented Syntroleum.  *Id.*
[2] Ex. 1035, U.S. Patent No. 4,992,605 (issued Feb. 12, 1991).
[3] Ex. 1036, U.S. Published Patent Application No. 2008/0312480 (filed June
13, 2008).
[4] Ex. 1064, David Kubíčka et al., *Transformation of Plant Oils to
Hydrocarbons*, APROCHEM 2007, 1149 (Apr. 16–18, 2007).  An English
translation of Kubíčka was submitted as Ex. 1063; our references to
"Kubíčka" herein are to the English language document.

2

IPR2013-00578
Patent No. 8,231,804

> 4.  Whether claim 5 is unpatentable under 35 U.S.C. § 103 as having
> been obvious over the combined teachings of Kubíčka and
> Gusmão[5].

Dec. 19–20.

Following institution, REG filed a Patent Owner Response to the Petition (Paper 16, "PO Resp."), and Neste filed a Reply (Paper 24, "Pet. Reply").  REG also filed a Motion to Amend pursuant to 37 C.F.R. § 42.121 (Paper 17, "Mot."), to which Neste filed an Opposition (Paper 25, "Pet. Opp."), and REG filed a Reply (Paper 30, "PO Reply").

Both parties filed Motions to Exclude Evidence, followed by Oppositions and Replies.  We decide these Motions in separate Decisions, issued concurrently with this Final Written Decision.  Papers 52, 53.

Neste supported its Petition with the Declaration of Michael T. Klein, Sc.D. (Ex. 1034, "first Klein Declaration"), and submitted a Second Declaration of Dr. Klein (Ex. 1072, "second Klein Declaration") with its Reply and Opposition to the Motion to Amend.  Cross-examination of Dr. Klein was taken during two depositions.  Exs. 2025, 2069.  REG filed a Motion for Observation Regarding Cross-Examination on the second deposition of Dr. Klein (Paper 39), and Neste filed a Response (Paper 46).

Along with its Reply and Opposition to the Motion to Amend, Neste also filed the Declaration of Maureen D. Queler, Neste's counsel, to support

---

[5] Ex. 1041, J. Gusmão et al., *Utilization of Vegetable Oils as an Alternative Source for Diesel-Type Fuel: Hydrocracking on Reduced Ni/SiO$_2$ and Sulphided Ni-Mo/γ-Al$_2$O$_3$*, 5 CATALYSIS TODAY 533 (1989).

3

IPR2013-00578
Patent No. 8,231,804

its contention that Kubíčka was publicly available and thus prior art to the '804 patent.  Ex. 1088.

With its Patent Owner Response and Motion to Amend, REG filed the Declaration of Dr. H. Henry Lamb.  Ex. 2020, "first Lamb Declaration".  REG filed a Second Declaration of Dr. Lamb with its Reply on its Motion to Amend (Ex. 2066, "second Lamb Declaration"), and Neste took the cross-examination of Dr. Lamb during two depositions.  Exs. 1073, 1140.  Neste filed a Motion for Observation Regarding Cross-Examination on Dr. Lamb's second deposition (Paper 36), and REG filed a Reply (Paper 44).

REG also filed the Declaration of Ramin Abhari (Ex. 2001, "first Abhari Declaration") to support its contention that Dindi is not prior art to the '804 patent, and submitted a Second Declaration with its Reply in support of the Motion to Amend (Ex. 2055, "second Abhari Declaration").  Neste cross-examined Mr. Abhari following his first Declaration.  Ex. 1074.

Oral hearing was requested by both parties and was held on November 13, 2014.  A transcript of the oral hearing is included in the record.  Paper 51, "Tr."

We have jurisdiction under 35 U.S.C. § 6(c).  This Final Written Decision, issued pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73, addresses issues and arguments raised during trial.  For the reasons discussed below, we determine that Neste has met its burden to prove, by a preponderance of the evidence, that claims 1–5 and 8 of the '804 patent are *unpatentable*.  We also determine that the substitute claims proposed by

4

**JA4**

IPR2013-00578
Patent No. 8,231,804

REG improperly enlarge the scope of the claims in violation of 35 U.S.C.
§ 316(d)(3), and thus, we *deny* the Motion to Amend.

### A.  The '804 Patent

The '804 patent is directed to paraffin compositions containing mainly
even carbon number paraffins, and methods of making such compositions.
Ex. 1033, Abstract.  Specifically, such compositions are useful in phase
change materials ("PCMs") which exploit the latent heat of the paraffins as a
passive thermal storage device.  *Id*. at 1:29–35.  For example, the
compositions can be incorporated into the wall boards of a house, where
they will absorb heat during the warm part of the day by undergoing a solid-
liquid phase transition, and then return the heat to the air by refreezing
during cooler portions of the day.  *Id*. at 1:39–48.

The specification of the '804 patent discloses that the thermal storage
capacity of the PCMs is determined by their latent heat, and that the latent
heat of even carbon number paraffins is higher than the latent heat of odd
carbon number paraffins with similar melting points.  *Id*. at 1:56–63; *id.* at
Table 1.  The '804 patent, therefore, seeks to increase the production of
paraffins via reaction pathways that result in a greater proportion of even
carbon number paraffins.  *Id*. at 3:33–35.  Specifically, the '804 patent
discloses one method that hydrogenates and deoxygenates naturally
occurring fatty acids and esters, such as bio-oils, to produce primarily even
carbon number paraffins.  *Id*. at 4:9–7:67.

5

IPR2013-00578
Patent No. 8,231,804

As the '804 patent notes, deoxygenation of a triglyceride, such as the ones found in bio-oil feedstocks, proceeds along one of two reaction pathways:

$$(1)$$
$$CH_2-O-CO-C_{17}H_{33}$$
$$CH-O-CO-C_{17}H_{33} \quad + \ 15 \ H_2 \longrightarrow 3 \ C_{18}H_{38} + C_3H_8 + 6 \ H_2O$$
$$CH_2-O-CO-C_{17}H_{33}$$

$$(2)$$
$$CH_2-O-CO-C_{17}H_{33}$$
$$CH-O-CO-C_{17}H_{33} \quad + \ 6 \ H_2 \longrightarrow 3 \ C_{17}H_{36} + C_3H_8 + 3 \ CO_2$$
$$CH_2-O-CO-C_{17}H_{33}$$

*Id.* at 3:15–25. As shown above, reaction pathway (1) depicts deoxygenation through hydrogenolysis, which results in a paraffin having the same number of carbon atoms as the fatty acid. Reaction pathway (2) depicts deoxygenation through decarboxylation, which results in a paraffin having one fewer carbon atom than the fatty acid feedstock. *Id.* at 3:26–32. As naturally occurring fatty acid feedstocks typically contain primarily even carbon number fatty acids, the '804 patent discloses a catalyst reaction which selectively prefers the hydrogenolysis pathway, resulting in primarily even carbon number paraffins. *Id.* at 4:2–8. During the disclosed process, the fatty acids are also hydrogenated such that any double bonds are saturated. *Id.* at 3:26–27.

B. *The Challenged Claims*

Of the previously issued claims challenged in this proceeding, only claim 1 is independent, while claims 2–5 and 8 depend directly from claim

6

IPR2013-00578
Patent No. 8,231,804

1.  Claim 1 is illustrative of the claimed subject matter of the '804 patent and is reproduced below:

> 1.      A phase change material composition comprising at least 75 wt % even carbon number paraffins, wherein the paraffins are produced by hydrogenation/hydrogenolysis of naturally occurring fatty acids and esters.

Ex. 1033, 12:29–32.

REG also proposes substitute claims 12–17, should the Board find any of the original claims unpatentable.  Mot. 3–4.  Claim 12 is the sole independent proposed claim, while claims 13–17 alter the dependencies of original claims 2–5 and 8, but do not propose additional limitations.  Claim 12 is illustrative of the proposed substitute claims and is reproduced below:

> 12.      (Substitute for original claim 1 should Claim 1 be found unpatentable) A phase change material composition comprising a liquid product of at least 75 wt% even carbon number paraffins in the $C_{12}$-$C_{24}$ range, wherein the paraffins of the liquid product are produced by hydrogenation/hydrogenolysis of naturally occurring fatty acids and esters, without distillation after the hydrogenation/hydrogenolysis.

*Id*. at 3 (underlining in original, designating language added through proposed amendment of claim 1).

## II.    DISCUSSION

### A.  Claim Construction

In an *inter partes* review, "[a] claim in an unexpired patent shall be given its broadest reasonable construction in light of the specification of the

7

**JA7**

IPR2013-00578
Patent No. 8,231,804

patent in which it appears."  37 C.F.R. § 42.100(b); *see also In re Cuozzo Speed Tech., LLC*, No. 2014-1301, 2015 WL 448667, at *5–*8 (Fed. Cir. Feb. 4, 2015) ("Congress implicitly adopted the broadest reasonable interpretation standard in enacting the AIA," and "the standard was properly adopted by PTO regulation").  Under this standard, we construe claim terms using "the broadest reasonable meaning of the words in their ordinary usage as they would be understood by one of ordinary skill in the art, taking into account whatever enlightenment by way of definitions or otherwise that may be afforded by the written description contained in the applicant's specification."  *In re Morris*, 127 F.3d 1048, 1054 (Fed. Cir. 1997).  We presume that claim terms have their ordinary and customary meaning.  *See In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007) ("The ordinary and customary meaning is the meaning that the term would have to a person of ordinary skill in the art in question.") (internal quotation marks omitted).  However, a patentee may rebut this presumption by acting as his own lexicographer, providing a definition of the term in the specification with "reasonable clarity, deliberateness, and precision."  *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994).  Only those terms which are in controversy need to be construed, and only to the extent necessary to resolve the controversy.  *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999).

For purposes of our Decision to Institute, we gave each claim term its broadest reasonable interpretation, as understood by one of ordinary skill in the art and as consistent with the specification of the '804 patent.  First, we

8

IPR2013-00578
Patent No. 8,231,804

determined that the preamble of claim 1, *a phase change material composition*, merely expressed an intended use and, therefore, was not limiting on the scope of the claim.  Dec. 9.  We also construed *hydrogenation/hydrogenolysis* as "hydrogenation and hydrogenolysis."  *Id.* at 11.  Neither party challenged these constructions during trial.  PO Resp. 17; *see generally* Pet. Reply.

During trial, several additional arguments were raised by the parties that—while not seeking explicit constructions of any particular claim term— are relevant to the scope of the claims as construed.  We address these contentions below.

### 1.  Product-by-Process Claim

As both parties acknowledge, claim 1 is a product-by-process claim. While the scope of a product-by-process claim for infringement purposes is limited by the process, when determining patentability the claim is considered only in view of the resulting product.  *See Amgen Inc. v. F. Hoffman-La Roche Ltd.,* 580 F.3d 1340, 1370 n.14 (Fed. Cir. 2009) ("a patent is invalid if a product made by the process recited in a product-by-process claim is anticipated by or obvious from prior art products, even if those prior art products are made by different processes").  Only if the process of manufacture results in "structural and functional differences" in the product can the process distinguish the claim over the prior art.  *Id.* at 1370; *see Greenliant Sys., Inc. v. Xicor LLC*, 692 F.3d 1261, 1268 (Fed. Cir. 2012).

9

IPR2013-00578
Patent No. 8,231,804

REG argues that the process recited in claim 1 results in "novel functional and structural features" in the claimed PCM. PO Resp. 9. According to REG, the complex nature of biological feedstocks, as well as the single-step hydrogenation/hydrogenolysis process, yields a "resulting composition [that] is a complex mixture of even and odd carbon number paraffins of various chain lengths, as well as other cyclical and oligomeric molecules." *Id*. at 9–10. As a result, the PCMs are said to have both high and low melting point constituents, leading to specific functional qualities that are beneficial in a PCM. *Id*. at 10–11.

We are unpersuaded that the product of claim 1 exhibits structural or functional differences that may be relied upon to distinguish over the prior art. Even if we were to assume that the process of claim 1 excludes distillation of the product—an argument we reject below—REG has not presented credible evidence that an undistilled product would contain a complex mix of components, or exhibit the alleged functionally distinct behavior. REG relies on the testimony of Dr. Lamb, who testifies that:

> [T]hese products are compositionally distinct from . . . products that are obtained through purification processes such as distillation or from other sources. *See, e.g.*, Craig, col. 11, ll. 45-50, Ex. 1035. This is because processes such as distillation, for example, will separate components in a mixture according to their relative volatility (which is how Craig obtains its light, middle, and heavy fractions). As a result, distilled products will be stripped of their light and heavy components, which in turn, has the effect of altering the phase-change behavior of the composition.

Ex. 2020 ¶ 34.

10

IPR2013-00578
Patent No. 8,231,804

Dr. Lamb, however, provides no basis for his testimony that distilled products exhibit altered phase-change behavior; nor does he provide any objective evidence that undistilled products exhibit complex behavior. The passage of Craig cited by Dr. Lamb merely states that Craig's resulting product is a "complex mixture of $C_{15}$–$C_{18}$ paraffinic hydrocarbons" that "could not be duplicated from petroleum or other sources." Ex. 1035, 11:45–50. Craig is silent regarding the phase change behavior resulting from such complexity.

Indeed, the specification of the '804 patent contradicts Dr. Lamb's testimony. First, the specification does not mention the "complexity" of the mixture of components as being relevant to its suitability as a PCM; rather, the specification highlights the latent heat of even carbon number paraffins—as contrasted with odd number paraffins—as making them suitable for use as PCMs. Ex. 1033, 1:60–2:20. Nor does the specification highlight distillation as affecting PCM suitability. To the contrary, it contemplates that a product that is distilled to separate out $C_{18}$ paraffins "can be sold as a PCM for narrow temperature control applications." *Id*. at 12:10–11.

REG has not provided any evidence of comparative testing that shows differences in the behavior of distilled and undistilled products. Given this lack of objective support, and the contradictory teachings of the specification of the '804 patent, we decline to credit Dr. Lamb's conclusory testimony on this point. 37 C.F.R. § 42.65(a) ("Expert testimony that does not disclose the underlying facts or data on which the opinion is based is entitled to little

11

IPR2013-00578
Patent No. 8,231,804

or no weight.").  We conclude that REG has not presented credible evidence that the product of claim 1 exhibits structural or functional differences over the prior art; therefore, the process of claim 1 cannot be used to distinguish the product over prior art products.

2.  "Direct Product" of Hydrogenation/Hydrogenolysis

Even if we were to determine that the record establishes that an undistilled product of hydrogenation/hydrogenolysis exhibits distinct functional properties, we are not persuaded that claim 1 requires the absence of distillation.  REG argues that the product of claim 1 is a "direct product" of the hydrogenation/hydrogenolysis process, relying on the specification and prosecution history of the '804 patent.  PO Resp. 18–22.

First, we note that the express language does claim 1 does not exclude additional processing steps after hydrogenation/hydrogenolysis.  REG emphasizes that the "claimed composition is the *product of* the hydrogenation/hydrogenolysis process." *Id.* at 18.  This is not an accurate representation of the claim, however.  The composition of claim 1 comprises at least 75 wt % even carbon number paraffins, wherein *paraffins* are produced by hydrogenation/hydrogenolysis.  It is not a requirement of claim 1 that the *composition* be formed by hydrogenation/hydrogenolysis.  Claim 1 does not address whether additional steps may be performed after production of the paraffins by hydrogenation/hydrogenolysis; therefore, we see no reason why the express language of the claim should be interpreted to impose such a limit.

12

IPR2013-00578
Patent No. 8,231,804

Regarding the specification, REG directs our attention to Figure 1, which discloses two product streams 111A and 115, which REG contends "result[] directly from the [] hydrogenation/hydrogenolysis process *after separation of non-liquid organic products*." *Id*. at 18–19 (citing Ex. 1033, Figure 1) (emphasis added). As highlighted in the quoted sentence, however, REG concedes that the disclosed process encompasses some steps, such as separation, after the hydrogenation/hydrogenolysis process. We discern no principled reason why a product that has undergone separation after hydrogenation/hydrogenolysis is still a "direct" product, whereas a product that has undergone distillation is not. Furthermore, as discussed in the preceding section, the specification expressly contemplates distillation of the product after hydrogenation/hydrogenolysis, providing further evidence that the claims are not limited to "direct products" of hydrogenation/hydrogenolysis. Ex. 1033, 12:10–11.

B. *Determination of Whether Kubíčka and Dindi are Prior Art*

As a threshold issue, we must determine whether the references cited by Neste have been established to be prior art to the '804 patent. There is no dispute that Craig and Gusmão qualify as prior art under 35 U.S.C. § 102(b). REG challenges whether Kubíčka is prior art under 35 U.S.C. § 102(b), arguing that Neste has failed to establish that it was published over a year prior to the filing date of the '804 patent, December 10, 2008. PO Resp. 51–

13

IPR2013-00578
Patent No. 8,231,804

53.  Neste asserts that Dindi is prior art under 35 U.S.C. § 102(e) because it was filed on June 13, 2008[6] (Pet. 21); REG attempts to disqualify Dindi as prior art by antedating its filing date.  PO Resp. 41–50.  We discuss Kubíčka and Dindi in detail below.

### 1.  Public Availability of Kubíčka

According to Neste, Kubíčka "was presented at the APROCHEM 2007 Waste Forum on April 17, 2007."  Pet. 34.  This is reflected in the program of the APROCHEM 2007 conference.  Ex. 1061, 4.  As REG correctly notes, however, this is not evidence that the Kubíčka paper was published as of the conference date.  PO Resp. 52.  As the only grounds of unpatentability a petitioner may raise in an *inter partes* review are those based on prior art consisting of patents or printed publications (35 U.S.C. § 311(b)), we must determine whether Kubíčka was published prior to December 10, 2007.

Neste has presented no evidence that the papers from the APROCHEM 2007 conference were distributed at the conference itself, nor does Neste attempt to establish that the conference typically made papers available within a certain period of time.  Rather, Neste asserts that Kubíčka was "publicly available at the Technical University of Ostrava library in

---

[6] REG argues that Neste has not established that Dindi is entitled to the June 15, 2007 filing date of its provisional application (PO Resp. 50–51), but Neste does not appear to assert a date earlier than Dindi's filing date of June 13, 2008.

IPR2013-00578
Patent No. 8,231,804

Ostrava-Poruba, Czech Republic as of May 22, 2007, and made available on-line as of April 30, 2007." Pet. Reply 15. For support, Neste provides the testimony of Maureen D. Queler, detailing her research into the public availability of the paper and correspondence with staff members of the University of Ostrava. Ex. 1088. Neste also cites to a translation of an entry from the library catalog from the University of Ostrava Central Library (Ex. 1102) and a translation of a webpage obtained from the Internet Archive's Wayback Machine (Ex. 1130), both of which Neste alleges establish the May 22, 2007 or April 30, 2007 publication dates.

As we note in our accompanying Decision on Patent Owner's Motion to Exclude (Paper 53), the critical exhibits cited by Ms. Queler in her Declaration as establishing Kubíčka's public availability—including Exhibits 1102 and 1130—are inadmissible hearsay, or lack sufficient authentication. Given the exclusion of these exhibits, the record does not support Neste's contention that Kubíčka was available as of May 22, 2007 or April 30, 2007. As such, Neste has failed to carry its burden of proving the public availability of Kubíčka prior to December 10, 2007, and Kubíčka has not been shown to be prior art under 35 U.S.C. § 102(b).

2. Antedation of Dindi

REG contends that Dindi is not prior art to the '804 patent, because Mr. Abhari invented the subject matter of the claims prior to the June 13, 2008 filing date of Dindi. PO Resp. 41. To remove Dindi as a prior art reference, the record must establish either: (1) a conception and reduction to

15

IPR2013-00578
Patent No. 8,231,804

practice before the filing date of Dindi; or (2) a conception before the filing date of the Dindi patent combined with diligence and reduction to practice after that date. *See Taurus IP, LLC v. DaimlerChrysler Corp.*, 726 F.3d 1306, 1323 (Fed. Cir. 2013). Under either approach, however, it must be proven that conception occurred prior to June 13, 2008. *See id.*

Conception is "the formation, in the mind of the inventor of a definite and permanent idea of the complete and operative invention, as it is thereafter to be applied in practice." *Coleman v. Dines*, 754 F.2d 353, 359 (Fed. Cir. 1985) (citing *Gunter v. Stream,* 573 F.2d 77, 80 (CCPA 1978)) (emphasis omitted). This requires more than accidental creation; there must be evidence that the inventor appreciated that he made "something new." *Invitrogen Corp. v. Clontech Labs., Inc.*, 429 F.3d 1052, 1063–64 (Fed. Cir. 2005). "The conception analysis necessarily turns on the inventor's ability to describe his invention with particularity. Until he can do so, he cannot prove possession of the complete mental picture of the invention." *Burroughs Wellcome Co. v. Barr Labs., Inc.*, 40 F.3d 1223, 1228 (Fed. Cir. 1994).

Proof of conception must be by "corroborating evidence which shows that the inventor disclosed to others his completed thought expressed in such clear terms as to enable those skilled in the art to make the invention." *Coleman*, 754 F.2d at 359 (citing *Field v. Knowles,* 183 F.2d 593, 601 (CCPA 1950)); *see also Mahurkar v. C.R. Bard, Inc.*, 79 F.3d 1572, 1577 (Fed. Cir. 1996) (corroboration requirement "arose out of a concern that inventors testifying in patent infringement cases would be tempted to

16

IPR2013-00578
Patent No. 8,231,804

remember facts favorable to their case by the lure of protecting their patent or defeating another's patent"). The sufficiency of corroboration is determined according to a "rule of reason." *Price v. Symsek*, 988 F.2d 1187, 1195 (Fed. Cir. 1993). This, however, does not dispense with the requirement that some independent evidence provide corroboration. *Coleman*, 754 F.2d at 360. The requirement of "independent" corroboration requires evidence other than the inventor's testimony. *In re NTP, Inc.* 654 F.3d 1279, 1291–92 (Fed. Cir. 2011).

As Patent Owner, the burden of production on antedation lies with REG, who must offer evidence showing Mr. Abhari's prior invention. *See Mahurkar,* 79 F.3d at 1576. The ultimate burden of persuasion in an *inter partes* review, however, remains on Neste, as Petitioner, to prove unpatentability by a preponderance of the evidence. 35 U.S.C. § 316(e); *see Tech. Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1329 (Fed. Cir. 2008) ("ultimate burden never shifts, however much the burden of going forward may jump from one party to another as the issues in the case are raised and developed").

In the case at hand, REG has offered evidence of prior invention, including the testimony of Mr. Abhari (Exs. 2001, 2055) and supporting documentary evidence such as gas chromatography data (Ex. 2004). REG having met its burden of production, Board evaluates the record as a whole to determine whether Neste, who bears the burden of persuasion, has proven by a preponderance of the evidence that Dindi is prior art. *See Mahurkar*, 79 F.3d at 1578.

17

IPR2013-00578
Patent No. 8,231,804

*Determination of Evidence to be Considered*

At the outset, as we note that in our accompanying Decision on Petitioner's Motion to Exclude, we have determined that several of the exhibits provided by Neste to corroborate Mr. Abhari's testimony are inadmissible as hearsay or for lacking proper authentication.  Paper 52.  We, therefore, will not consider this evidence as part of this Decision.

Neste has also objected to several of the exhibits submitted along with REG's Reply Brief regarding the Motion to Amend, as being beyond the scope of proper reply evidence.  *See* Paper 33, 2.  Specifically, Neste identified the following exhibits: 1) Exhibits 2057 and 2058, relevant to prior conception; 2) Exhibits 2053 and 2061, relevant to suitability for intended use; and 3) Exhibits 2062–2064, relevant to diligence.  *Id*.  We advised Neste that it could raise such objections at the oral hearing, and the Board would determine, upon reviewing the record as a whole, whether the exhibits constitute improper reply.  *Id*. at 3.

Our Rules limit the scope of replies, and any supporting evidence, to responding to arguments made in the corresponding opposition or patent owner response.  37 C.F.R. § 42.24.  As explained in our Trial Practice Guide:

> While replies can help crystalize issues for decision, a reply that raises a new issue or belatedly presents evidence will not be considered . . . . Examples of indications that a new issue has been raised in a reply include new evidence necessary to make out a prima facie case for the patentability or unpatentability of an original or proposed substitute claim, and new evidence that could have been presented in a prior filing.

18

IPR2013-00578
Patent No. 8,231,804

*Office Patent Trial Practice Guide*, 77 Fed. Reg. 48,756, 48,767 (Aug. 14, 2012).

Upon review, we determine that Exhibit 2053 constitutes improper reply evidence, as it is new evidence that could have been presented with REG's Patent Owner Response. The exhibit, a February 19, 2008 internal Syntroleum Corp. memorandum authored by Mr. Abhari, was first provided to Neste during Mr. Abhari's first deposition (Ex. 1074, 109:7–8), and cited for the first time in REG's Reply to Neste's Opposition to the Motion to Amend. PO Reply, 6.

During cross-examination, Mr. Abhari testified that he "did not really search for [Exhibit 2053] very hard" prior to submitting his first Declaration. Ex. 1074, 116:10–11. He also noted that he "did not have any problem finding it once [he] really looked for it," about two weeks prior to his deposition. *Id*. at 119:2–5. These concessions by Mr. Abhari demonstrate that Exhibit 2053 could have been presented in a prior filing, if Mr. Abhari had searched diligently for the memorandum prior to that point.

We also note that Exhibit 2053, relied upon in Mr. Abhari's Second Declaration, is not linked to rebutting any particular fact or argument set forth by Neste. Rather, Mr. Abhari asserts generally that he appreciated the potential use of even carbon number paraffins as PCMs by "late 2007 or early 2008," and cites Exhibit 2053 as evidence of that fact. Ex. 2055 ¶ 28. By contrast, other evidence cited in Mr. Abhari's Second Declaration is linked directly to assertions made by Dr. Klein. *See, e.g., id.* ¶ 38 (citing Ex. 2062 to rebut alleged gaps in diligence identified by Dr. Klein in Ex. 1082).

19

**JA19**

IPR2013-00578
Patent No. 8,231,804

We conclude from this that REG is relying on Exhibit 2053 to make out its prima facie case of prior invention, which should have been established in its Patent Owner Response. For these reasons, we determine that Exhibit 2053 is improper reply evidence, and will not be considered.

Two other objected-to exhibits were also the subject of evidentiary objections made in Neste's Motion to Exclude, in which we determined that the exhibits are inadmissible. We, therefore, need not address whether Exhibits 2057 and 2062 are improper reply evidence.

The remaining exhibits objected to by Neste as being improper reply appear to be responsive to particular arguments made in Neste's Reply or Opposition to the Motion to Amend, and reasonably could not have been submitted earlier without knowing in advance what arguments Neste would present. Therefore, we will consider Exhibits 2058, 2061, and 2063–2064.

*Evidence Allegedly Supporting Conception*

The evidence of record establishes the following timeline of events prior to Dindi's June 13, 2008 filing date. In May of 2007, Mr. Abhari testifies that he ran a sample of canola oil through a slurry reactor containing a nickel molybdenum (NiMo) oxide catalyst. Ex. 2001 ¶ 14. On May 31, 2007, a sample obtained from that reactor was subjected to gas chromatography analysis, and resulted in the plot submitted as Exhibit 2004. According to Mr. Abhari, the large peak on Exhibit 2004 corresponds to n-octadecane, or n-$C_{18}$, an even carbon number paraffin. Ex. 2001 ¶ 21. The record establishes that further test runs and GC analyses were run from

20

IPR2013-00578
Patent No. 8,231,804

June to August of 2007.  Ex. 2007.

On July 19, 2007, Mr. Abhari informed his colleagues that he intended to contact Intertek PARC, regarding testing using its P-63 reactor unit.  Ex. 2009.  As of August 15, 2007, Mr. Abhari's project was in the testing queue at PARC, and remained in the queue until at least December 6, 2007.  Ex. 2010.  Though Mr. Abhari testifies that the testing was for the purpose of reducing to practice the invention of the '804 patent, none of the emails contained in Exhibits 2009 or 2010 discuss the purpose of the proposed PARC testing.  Ex. 2001 ¶ 35.

Given the delays at the PARC facility, Mr. Abhari contacted SwRI, another testing facility, regarding use of its reactor as a pilot plant on October 19, 2007.  Ex. 2011.  Mr. Abhari proposed an objective of "[c]onvert[ing] 1,200 gallons of bio-feedstock to synthetic diesel product using SwRI's large (2 gal/h) fixed-bed hydrogenation unit."  *Id*.  No mention was made of phase change materials or the significance of even carbon number paraffins.

Testing at SwRI continued into 2008; on March 12, 2008, SwRI reported to Mr. Abhari that the product of the reaction runs was between 91% and 98% $C_{14}$–$C_{18}$.  Ex. 2058.  The correspondence between SwRI and Mr. Abhari does not indicate any significance of even carbon number paraffins or phase change materials.  Data continued to be received from SwRI through July 2008.  *Id*.

21

**JA21**

IPR2013-00578
Patent No. 8,231,804

Finally, by March 6, 2008, Mr. Abhari had contacted Dawn Mantz of Microtek Labs. Ex. 2061.[7] In his testimony, Mr. Abhari does not specify the nature of the material sent to Microtek Labs, or how it was produced. Mr. Abhari does testify, however, that "Microtek specializes in PCM technology and is a provider of thermal performance products," which he contends implies that he must have appreciated that the material might have use as a PCM on or before March 6, 2008. Ex. 2055 ¶ 30.

*Analysis*

Upon reviewing the record as a whole under the "rule of reason," we determine that the evidence does not establish, by corroborating evidence, that Mr. Abhari conceived the invention of the challenged claims prior to June 13, 2008. No evidence, other than the testimony of the inventor, shows that Mr. Abhari appreciated the significance of the claimed invention, in particular a composition having over 75 wt% even carbon number paraffins. *See Invitrogen*, 429 F.3d at 1063. While the test results of May 31, 2007 (Ex. 2004) may establish that Mr. Abhari manufactured such a product on that date, the test results themselves do not indicate that any special significance was attached to the results. We are presented only with Mr.

---

[7] In response to Neste's objection that Exhibit 2061 is inadmissible hearsay, REG argued that the exhibit was not being offered for the truth of the matters asserted in the email, but rather to corroborate Mr. Abhari's testimony that he contacted Microtek. Paper 43, 13. We, therefore, do not consider the content of the email, but solely cite the exhibit as evidence that Mr. Abhari had contacted Ms. Mantz at Microtek.

22

IPR2013-00578
Patent No. 8,231,804

Abhari's uncorroborated testimony that he recognized the significance of the May 31, 2007 test results.

Nor does the fact that Mr. Abhari undertook steps to arrange pilot plant testing indicate an appreciation that he had made something new.  The correspondence between Mr. Abhari and the PARC and SwRI test facilities does not indicate what process Mr. Abhari was attempting to test. Exs. 2009, 2010, 2011, 2058.  Indeed, Mr. Abhari mentioned only the production of "diesel product"—not PCMs—in his initial proposal to SwRI.  Ex. 2011.  Again, the only evidence that Mr. Abhari was seeking to test the production of a PCM within the scope of the challenged claims comes from Mr. Abhari's own testimony.

Finally, while Mr. Abhari's contact with Microtek may be circumstantial evidence that he wished to discuss PCMs with Ms. Mantz,[8] we cannot determine from Exhibit 2061 what specific product or process Mr. Abhari had in mind.  The exhibit cannot demonstrate that Mr. Abhari recognized the significance of the product of the challenged claims, because there is no evidence—other than Mr. Abhari's testimony—that the email was in regard to such a product.

Similarly, we cannot conclude from any of the foregoing evidence that Mr. Abhari disclosed his invention to anyone, as required for proof of conception.  *See Coleman*, 754 F.2d at 359.  The test results in May of 2007,

---

[8] As noted above, we do not consider the content of the email, as REG is not offering it to prove the truth of the matters asserted.

23

IPR2013-00578
Patent No. 8,231,804

and the test results from SwRI, are not communications from Mr. Abhari. The correspondence with PARC, SwRI, and Microtek, on the other hand, do not contain anything resembling a disclosure of the invention of the challenged claims.

Applying the rule of reason to these facts as a whole, we cannot conclude that the record establishes, by corroborated evidence, that Mr. Abhari conceived of the invention of the challenged claims prior to the June 13, 2008 filing date of Dindi. We, therefore, find that Neste has met its burden of proving that Dindi is prior art to the challenged claims under 35 U.S.C. § 102(e).

### C. Anticipation by Dindi

Neste contends that claims 1–3, 5, and 8 are unpatentable as anticipated by Dindi. Pet. 21–30. We instituted trial on this ground, finding persuasive Neste's unchallenged analysis in its Petition of how the elements of the challenged claims are taught by Dindi. Dec. 14–15. In its Response, REG does not address the merits of Neste's proposed ground, instead devoting its attention to its attempt to antedate Dindi. PO Resp. 41–50. At oral hearing, REG's counsel did not concede that Dindi anticipates the claims if the Board determines it to be prior art, but acknowledged that REG had not put forth any arguments addressing the merits of Neste's proposed ground. Tr. 28–29.

Our Scheduling Order in this case cautioned REG that "any arguments for patentability not raised in the [Patent Owner Response] will be deemed

24

IPR2013-00578
Patent No. 8,231,804

waived."  Paper 11, 3.  The Board's Trial Practice Guide, furthermore, states that the Patent Owner Response "should identify all the involved claims that are believed to be patentable *and state the basis for that belief*." *Office Patent Trial Practice Guide*, 77 Fed. Reg. 48,756, 48,766 (Aug. 14, 2012) (emphasis added).  By addressing only the antedation of Dindi, REG conveyed to the Board and Neste that antedation was the only basis for its belief that the challenged claims are patentable.  As the Board has stated, our governing statute and Rules "clearly place some onus on the patent owner, once trial is instituted, to address the material facts raised by the petition as jeopardizing patentability of the challenged claims."  *Johnson Health Tech Co. Ltd. v. Icon Health & Fitness, Inc*., Case IPR2013-00463, slip op. 12 (PTAB Jan. 29, 2015) (Paper 41).

In our Decision to Institute, we concluded that Neste had made a threshold showing that Dindi taught all the limitations of the challenged claims, sufficient for us to conclude that there was a reasonable likelihood that Neste would prevail in showing that the challenged claims were anticipated by Dindi.  Dec. 14–16.  We must now determine whether the preponderance of the evidence of record supports a finding that Dindi anticipates the challenged claims.  35 U.S.C. § 316(e).  Given REG's waiver of argument on the merits, the record now contains the same arguments and evidence regarding the merits of Dindi's alleged anticipation as it did at the time of our Decision to Institute.  Accordingly, the preponderance of the evidence of record now supports a finding that Neste has set forth how all limitations of the challenged claims are taught by Dindi.

25

IPR2013-00578
Patent No. 8,231,804

For instance, Example 10 of Dindi discloses the production of paraffins from soybean oil, resulting in 92.5 wt % $C_{16}$ and $C_{18}$.  Ex. 1036 ¶ 76.  This meets claim 1's requirement of at least 75 wt % even carbon number paraffins, as well as claim 2's requirement of at least 80 wt %. Claim 3's requirement of n-hexadecane and n-octadecane is also met.  As we have determined that the claims are product-by-process claims, the remaining process limitations of claim 1 are not relevant to the anticipation inquiry.

Similarly, with respect to claim 5, Example 14 of Dindi processes refined coconut oil, resulting in a product containing 91 wt% even carbon number paraffins, including 43.5% $C_{12}$ and 17.5% $C_{14}$.  *Id.* ¶ 81.  This meets claim 5's requirement that the even carbon number paraffins comprise n-dodecane and n-tetradecane.  Finally, the Examples of Dindi utilize cobalt/nickel/molybdenum or nickel/molybdenum catalysts, meeting claim 8's requirement of a catalyst containing nickel, molybdenum, cobalt, and/or tungsten.  *See id.* ¶¶ 76, 78.

Based on this evidence, we determine that Neste has proven, by a preponderance of the evidence, that Dindi discloses all the product elements[9]

---

[9] In addition, we note that, even if the process limitations of the claims were relevant to patentability, Dindi discloses that its products are formed by hydrogenation/hydrogenolysis of naturally occurring fatty acids such as soybean oil.  *See* Ex. 1036 ¶¶ 38, 39, 76.

26

IPR2013-00578
Patent No. 8,231,804

of claims 1–3, 5, and 8.  We, therefore, conclude that Dindi anticipates
claims 1–3, 5, and 8.

### D. Anticipation by Craig

Neste contends that Craig anticipates claims 1, 3, 4, and 8 of the '804
patent.  Pet. 10–19.  Neste primarily relies on Table 9 of the reference,
which discloses naturally occurring feedstocks such as canola oil, rapeseed
oil, and palm oil, and the makeup of the hydrocarbon product produced from
each feedstock.  Ex. 1035, Table 9.  The Table lists the results of GC-MS
(gas chromatography-mass spectrometry) analysis of the products, expressed
as peak area percentages of each hydrocarbon (e.g., $C_{16}$, $C_{17}$, $C_{18}$, etc.).  *Id*.
For example, hydrotreating of "Canola Oil, Premium Quality, 210–343 ºC
cut" results in a product having peak area percentages of 3.1 % $C_{16}$, 78.28%
$C_{18}$, and 1.38% $C_{20}$.  *Id*.

REG directs a number of criticisms against Table 9 of Craig.  First,
REG argues that, to the extent that the Table reports the product of "cuts" of
the biological feedstocks, it is reporting product that has been distilled to
obtain isolated fractions of the product of an hydrogenation/hydrogenolysis
process.  PO Resp. 25.  This argument, however, is grounded in REG's
contention that claim 1 requires that the PCM be the "direct product" of
hydrogenation/hydrogenolysis (*id*. at 27), a claim construction we rejected
above.  Claim 1 does not exclude the use of additional processing steps after
the hydrogenation/hydrogenolysis process; REG expressly acknowledges
this fact, noting the claimed invention is "obtained directly from

27

IPR2013-00578
Patent No. 8,231,804

hydroprocessing a biological feedstock (*albeit after separating out other components such as water, light hydrocarbon gases, hydrogen, catalyst, etc.*)" *Id.* (emphasis added).  Thus, we determine that distillation of the Craig products does not remove them from the scope of the challenged claims.

REG also notes that Table 9 reports "hydrocarbons," which is broader than the claimed "paraffins."  *Id.* at 33.  As such, REG argues, even if the reported percentages of even carbon number hydrocarbons are greater than 75%, it cannot be determined whether those are entirely even carbon number *paraffins*.  *Id*.  We do not find this argument persuasive because, as Neste notes, the specification of Craig describes Table 9 as showing "GCMS analysis of the 210º–343º C. fraction" which "showed its composition to be $C_{15}$–$C_{18}$ *paraffins*."  Ex. 1035, 11:10–12 (emphasis added).  The record supports Neste's contention that the "hydrocarbons" of Table 9, viewed in light of the Craig specification, would have been understood by one of ordinary skill in the art to refer to paraffins.  Ex. 1072 ¶ 74; Ex. 1073, 37:5–9 (REG's expert Dr. Lamb agrees that Table 9 reports area percentage of paraffins).

Craig's Table 9 also contains a footnote, which states that "[t]he summation of yields of $C_{15}$–$C_{24}$ accounts for on average 90% of the total peak area."  Ex. 1035, Table 9.  REG argues that "at least one possible interpretation is that the percentages reported in Table 9 fail to account for an additional 10% of material that falls outside of the $C_{15}$–$C_{24}$ range."  PO

28

IPR2013-00578
Patent No. 8,231,804

Resp. 35.  As such, REG contends that the peak area percentages of Table 9 must be multiplied by 90% to determine the actual percentage present.  *Id*.

We do not consider REG's "possible interpretation" of the footnote to be a reasonable one.  As Table III of Dr. Lamb's Declaration shows, the total area reported for each of the feedstocks of Table 9 ranges from 84.34 to 98.81.  Ex. 2020 ¶ 51.  Averaging the total areas for each of the eight feedstocks results in an average reported area of 92.16.  *Id*.  The most reasonable conclusion is that the footnote of Table 9, in stating that "summation of yields of $C_{15}$–$C_{24}$ accounts for on average 90% of the total peak area," is referring to this fact.  This is further supported by the fact that, as Neste notes, the footnote also refers to the reported percentages as "Percentage of *Total* GCMS Peak Area."  Ex. 1035, Table 9 (emphasis added).  In other words, the percentages of Table 9 already account for the, on average, unreported 10% of the product; there is no need to reduce the reported percentages again to compensate, as REG proposes.

Finally, REG points out that Table 9 discloses area percentages from a GCMS plot, whereas the challenged claims require weight percentages.  PO Resp. 33–34.  Neste concedes that these are not the same measure, but advances two alternative arguments.  First, Dr. Klein testifies that it is common practice in the art to use peak areas on a gas chromatography trace to approximate weight percentage of various components.  Ex. 1034 ¶ 24.  Second, Dr. Klein states that "relative response factors" may be used to convert peak area percentages to weight percentages.  *Id*. ¶¶ 25–26.

29

IPR2013-00578
Patent No. 8,231,804

We disagree with Neste's first contention that GCMS area percentages can, on their own, be used to approximate weight percentages. On cross-examination, the only support Dr. Klein could provide for his statement that area percent and weight percent is a commonly used approximation was the disclosure of Dindi. Ex. 1072, 64:20–66:15. As Dr. Lamb notes, however, Dindi discloses the use of a different type of gas chromatography, GC-FID, for quantification of compounds in a sample. Ex. 2020 ¶ 41 (citing Ex. 1036 ¶ 63). Furthermore, Dr. Klein could not state the accuracy of the approximation between GCMS area percentages and weight percentages. Ex. 1072, 51:5–52:8. Without more, we cannot conclude that Table 9's GCMS area percentages establish, by a preponderance of the evidence, weight percentages within the ranges claimed.

Turning to Neste's argument that relative response factors can be used to convert GCMS peak area percentages into weight percentages, Dr. Klein first used relative response factors reported by Hsu to conclude that, for example, Table 9 discloses that Canola Oil, Premium Quality results in 83.66% even carbon number paraffins. Ex. 1034 ¶¶ 26, 39. REG responded by arguing that using Hsu's relative response factors was inappropriate, because "response factors are not only sensitive to the type of detector being used for the GC experiment . . . but are also specific to the actual machine

30

IPR2013-00578
Patent No. 8,231,804

being used.  PO Resp. 34; *see also* Ex. 2023,[10] 140 ("[t]he use of [relative response factors] obtained from literature values will always need some correction due to different experimental conditions and instrumentation").  Because Craig does not disclose a relative response factor, or state what machine is used, REG contends that Craig does not provide enough information to convert peak area percentages accurately to weight percentages using relative response factors.

In his Second Declaration, Dr. Klein calculated weight percentages using relative response factors found in the Göröcs and Chaurasia[11] references cited by Dr. Lamb in his testimony.  Ex. 1072 ¶ 84.  Dr. Klein also assumed that the entire unreported area of Table 9 was comprised of odd carbon number paraffins, to address another of Dr. Lamb's criticisms.  *Id*.  Dr. Klein compared the results from these three conversions in Table 2 of his Second Declaration.  *Id*. ¶ 88.

Based on our review of the testimony of Drs. Klein and Lamb, as well as the cited supporting evidence, we conclude that Dr. Klein's Table 2 provides sufficient evidence that Table 9 discloses products with even

---

[10] N. Göröcs, et al., *The Determination of GC–MS Relative Molar Responses of Some n-Alkanes and their Halogenated Analogs*, 51 J. OF CHROMATOGRAPHIC SCI. 138–145 (2013) ("Göröcs").

[11] Ex. 2024, C. Chaurasia, et al., *Quantitation of Fatty Acids and Hydroxy Fatty Acids by Gas Chromatography/Mass Spectrometry. Predictively Useful Correlations of Relative Response Factors with Empirical Formula*, 30 J. OF MASS SPECTROMETRY 1018–22 (1995) ("Chaurasia").

IPR2013-00578
Patent No. 8,231,804

carbon number paraffins within the weight percentage range of claim 1.  For example, the lowest calculated weight percentage for Canola Premium is 82.31 wt %, over 7% higher than the 75 wt % claimed.  While the relative response factors of Hsu, Göröcs, and Chaurasia lead to different calculated weight percentages, the differences between the highest and lowest calculated value for each feedstock are modest, ranging from 0.26% (Canola Premium) to 1.17% (Rapeseed Oil 210–343 ºC cut).  Given the slight degree of variation, we consider it unlikely that any variations and corrections required by the experimental conditions would result in a weight percentage that is 7% lower than that reported by Dr. Klein.

We cannot, however, draw the same conclusion with regard to claim 2's requirement of at least 80 wt% even carbon number paraffins.  Only two samples are calculated in Dr. Klein's Table 2 to fall within this range: Canola Premium (lowest value of 82.31 wt%) and Rapeseed Oil 343 ºC + cut (lowest value of 80.03 wt%).  Ex. 1072 ¶ 88.  Considering the variation in Dr. Klein's calculated weight percentages, these values are too close to claim 2's 80 wt% boundary to conclude that Neste has established, by a preponderance of the evidence, that Table 9 of Craig discloses compounds that fall within the scope of claim 2.

Regarding the other dependent claims, we note that REG does not argue their patentability independently of claim 1.  Nevertheless, we find that the additional elements of these claims are also disclosed by Craig.  The "canola oil, premium quality" example of Table 9 discloses that the product is over 75% even carbon number paraffins and contains both n-hexadecane

32

IPR2013-00578
Patent No. 8,231,804

($C_{16}$) and n-octadecane ($C_{18}$), satisfying claim 3.  Ex. 1035, Table 9.
Similarly, the "rapeseed oil 343 ºC + cut" example discloses that the product
is over 75% even carbon number paraffins and contains both n-octadecane
($C_{18}$) and n-docosane ($C_{22}$), satisfying claim 4.  *Id*.  Finally, the process of
Craig occurs in the presence of cobalt-molybdenum, nickel molybdenum, or
other transition metal based catalysts, meeting claim 8's requirement of a
catalyst containing nickel, molybdenum, cobalt, and/or tungsten.  *Id*. at
2:60–65.

For the foregoing reasons, we conclude that Neste has proven, by a
preponderance of the evidence, that claims 1, 3, 4, and 8 are anticipated by
Craig.  The preponderance of the evidence does not support that claim 2 is
anticipated by Craig.

### E.  Grounds of Unpatentability That Rely on Kubíčka

As discussed above, we determine that Neste has failed to meet its
burden of proving that Kubíčka is prior art to the '804 patent.  Accordingly,
Neste cannot carry its burden of proving unpatentability on either instituted
ground based on Kubíčka.

## III.  MOTION TO AMEND CLAIMS

Because we have found claims 1–5 and 8 to be unpatentable as
anticipated by at least one of Craig or Dindi, we turn to REG's Motion to
Amend Claims.  Dispositive here is 35 U.S.C. § 316(d)(3)'s prohibition on
enlarging the scope of the claims via a motion to amend.  "A new claim
enlarges if it includes within its scope any subject matter that would not have

33

IPR2013-00578
Patent No. 8,231,804

infringed the original patent." *Thermalloy, Inc. v. Aavid Eng'g, Inc.*, 121
F.3d 691, 692 (Fed. Cir. 1997).

Neste argues that REG impermissibly broadened the scope of the
claims when it proposed claim 12, which requires that the PCM comprise "a
liquid product of at least 75 wt % even carbon number paraffins in the $C_{12}$-
$C_{24}$ range." Pet. Opp. 1–2. By contrast, claim 1 requires that the PCM
comprise "at least 75 wt % even carbon number paraffins." The key
distinction between these claims, Neste contends, is claim 12's requirement
that the even carbon number paraffins make up 75 wt % of a liquid product
*component* of the PCM, rather than 75 wt % of the *entire* PCM as required
in claim 1. Neste hypothesizes, as an example highlighting this distinction,
"a PCM in which the 'liquid product' made up only 10% of the overall
PCM, with the remaining 90% comprising some other material." *Id*. at 1. In
such a situation, the even carbon number paraffins would be 75 wt% of the
liquid product, but only 7.5 wt% of the overall PCM. Such a PCM would
fall within the scope of claim 12, but not claim 1.

Seemingly acknowledging this defect in its proposed claims, REG
argues that claim 12, which uses the transitional phrase *comprising*, should
be interpreted—contrary to its typical construction—to signify a closed-
ended claim. PO Reply 1. In other words, REG asks that we construe its
use of *comprising*, in this instance, to mean *consisting of*. As support for
this argument, REG directs us to its prior arguments, which it contends
signal an intent to make the claims closed-ended, and cites to the Federal

34

IPR2013-00578
Patent No. 8,231,804

Circuit's decision in *Dippin' Dots, Inc. v. Mosey*, 476 F.3d 1337 (Fed. Cir. 2007).

At the outset, we do not read the *Dippin' Dots* decision to permit us to read a transitional phrase directly in contradiction to its typical meaning. The issue presented in that case was whether, in a method claim with multiple steps, the use of the transitional phrase *comprising* made only the number of steps in the process open-ended, or whether the transitional phrase also "reached into" the individual steps of the process.  *Id*. at 1343. While the court determined that the steps themselves were not open-ended, it also reconfirmed the well-established rule that "the term 'comprising' raises a presumption that the list of elements is nonexclusive."  *Id.*; *see Promega Corp. v. Life Techs. Corp.,* 773 F.3d 1338, 1350 (Fed. Cir. 2014).  We do not understand the Federal Circuit to have held, as REG characterizes the decision, that "per the patentee's intent the term [comprising] may be closed-ended."  PO Reply 1.

Here, REG is not arguing that the *comprising* transitional phrase is open-ended in the preamble, but does not reach into subsequent elements, as was the case in *Dippin' Dots*; rather, REG argues that *comprising* should be construed at odds with its presumed meaning.  We do not discern any reason to adopt such a drastic construction in this case.  If REG intended for *comprising* to mean *consisting of*, as it now argues, the proper place for expressing a preference for such a construction would have in the Motion to Amend.  *See Idle Free Sys., Inc. v. Bergstrom, Inc.,* Case IPR2012-00027, slip op. at 7 (PTAB June 11, 2013) (Paper 26) (requiring that a motion to

35

IPR2013-00578
Patent No. 8,231,804

amend identify how any new claim terms are to be construed).  Or, more appropriately, if REG intended for the claim to have been closed-ended, it should have drafted the claim using a closed-ended transitional phrase such as *consisting of*, rather than expecting the Board and the public to divine such an "intent" implied by its patentability arguments.[12]

For these reasons, we decline to construe the term *comprising*, as used in proposed claim 12, as anything but its presumed, open-ended meaning. Under such a construction, it is clear that the scope of claim 12 encompasses products that claim 1 does not, as Neste has pointed out in its examples. Therefore, we conclude that the proposed claims impermissibly enlarge the scope of the claims, and deny REG's Motion to Amend.

## IV.  CONCLUSION

We conclude that Neste has demonstrated by a preponderance of the evidence that claims 1–5 and 8 of the '804 patent are unpatentable under 35 U.S.C. § 102, as anticipated by the disclosure of at least one of Craig or

---

[12] At oral hearing, REG raised for the first time an argument that "the Board has the power to entertain subsequent amendments," and that if we disagreed with REG's argument regarding claim 12's *comprising* transitional phrase, REG would accept entry of an amended claim using the transitional phrase *consisting of*.  Tr. 90–91.  Whether the Board has such power is beside the point, because we note that—as REG acknowledges—it did not seek authorization to file a second Motion to Amend as permitted by our Rules. *Id*. at 91; *see* 37 C.F.R. § 42.121(c).  We decline to *sua sponte* enter an amendment to REG's claims, as it would deprive Neste of the ability to address the patentability of such claims via briefing and evidence.

IPR2013-00578
Patent No. 8,231,804

Dindi.  Proposed substitute claims 12–18 are not entered, as REG's Motion to Amend is denied.

## V.   ORDER

In consideration of the foregoing, it is

ORDERED that claims 1–5 and 8 of U.S. Patent No. 8,231,804 are *unpatentable*;

FURTHER ORDERED that Patent Owner's Motion to Amend Claims is *denied*; and

FURTHER ORDERED that, because this is a final decision, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

IPR2013-00578
Patent No. 8,231,804

For Petitioner:

Michael J. Flibbert
Anthony A. Hartmann
Maureen Queler
FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER, LLP
michael.flibbert@finnegan.com
hartmana@finnegan.com
maureen.queler@finnegan.com

For Patent Owner:

Joseph P. Meara
Jeanne Gills
Michael R. Houston
FOLEY & LARDNER LLP
jmeara@foley.com
jmgills@foley.com
mhouston@foley.com

38



US008231804B2

(12) **United States Patent**

Abhari

(10) **Patent No.:** **US 8,231,804 B2**

(45) **Date of Patent:** **Jul. 31, 2012**

(54) **EVEN CARBON NUMBER PARAFFIN COMPOSITION AND METHOD OF MANUFACTURING SAME**

(75) Inventor: **Ramin Abhari**, Bixby, OK (US)

(73) Assignee: **Syntroleum Corporation**, Tulsa, OK (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 790 days.

(21) Appl. No.: **12/331,906**

(22) Filed: **Dec. 10, 2008**

(65) **Prior Publication Data**

US 2010/0145114 A1    Jun. 10, 2010

(51) **Int. Cl.**
*C09K 5/00* (2006.01)
*C07C 4/00* (2006.01)

(52) **U.S. Cl.** ................. 252/73; 585/240; 585/9; 585/16

(58) **Field of Classification Search** ................ 585/9, 16, 585/17, 240; 252/73, 73

See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2,163,563 A | 6/1939 | Schrauth | |
| 2,915,447 A * | 12/1959 | Arabian | 208/21 |
| 4,992,605 A | 2/1991 | Craig et al. | |
| 5,647,226 A * | 7/1997 | Scaringe et al. | 62/457.2 |
| 5,705,722 A | 1/1998 | Monnier et al. | |
| 5,851,338 A | 12/1998 | Pushaw | |
| 6,185,742 B1 * | 2/2001 | Doherty | 2/81 |
| 6,574,971 B2 * | 6/2003 | Suppes | 62/91 |
| 6,846,778 B2 | 1/2005 | Johnson et al. | |
| 6,855,410 B2 | 2/2005 | Buckley | |
| 7,232,935 B2 | 6/2007 | Jakkula et al. | |

| | | | |
|---|---|---|---|
| 7,511,181 B2 * | 3/2009 | Petri et al. | 585/240 |
| 7,550,634 B2 * | 6/2009 | Yao et al. | 585/240 |
| 7,691,159 B2 * | 4/2010 | Li | 44/605 |
| 7,718,051 B2 * | 5/2010 | Ginosar et al. | 208/113 |
| 7,816,570 B2 * | 10/2010 | Roberts et al. | 585/240 |
| 7,836,722 B2 * | 11/2010 | Magill et al. | 62/457.3 |
| 7,928,273 B2 * | 4/2011 | Bradin | 585/14 |
| 7,968,757 B2 * | 6/2011 | Abhari et al. | 585/240 |
| 2004/0055209 A1 | 3/2004 | Jakkula et al. | |
| 2004/0067856 A1 | 4/2004 | Johnson et al. | |
| 2004/0230085 A1 | 11/2004 | Jakkula et al. | |
| 2005/0150815 A1 | 7/2005 | Johnson et al. | |
| 2006/0161032 A1 | 7/2006 | Murzin et al. | |
| 2006/0186020 A1 | 8/2006 | Gomes | |
| 2006/0199984 A1 | 9/2006 | Kuechler et al. | |
| 2006/0207166 A1 | 9/2006 | Herskowitz et al. | |

(Continued)

FOREIGN PATENT DOCUMENTS

EP        1728844        12/2006

(Continued)

OTHER PUBLICATIONS

Sharma, S.D.; Sagara, K. "Latent Heat Storage Materials and Systems: A Review", International Journal of Green Energy, 2: 1-56, 2005.

(Continued)

*Primary Examiner* — Nina Bhat
(74) *Attorney, Agent, or Firm* — Hall Estill Law Firm

(57) **ABSTRACT**

Paraffin compositions including mainly even carbon number paraffins, and a method for manufacturing the same, is disclosed herein. In one embodiment, the method involves contacting naturally occurring fatty acid/glycerides with hydrogen in a slurry bubble column reactor containing bimetallic catalysts with equivalent particle diameters from about 10 to about 400 micron. The even carbon number compositions are particularly useful as phase change material.

**11 Claims, 7 Drawing Sheets**



**JA39**

Neste Exhibit 1033

**US 8,231,804 B2**

Page 2

**U.S. PATENT DOCUMENTS**

| | | | |
|---|---|---|---|
| 2006/0264684 A1 | 11/2006 | Petri et al. | |
| 2007/0006523 A1 | 1/2007 | Myllyoja et al. | |
| 2007/0010682 A1 | 1/2007 | Myllyoja et al. | |
| 2007/0131579 A1 * | 6/2007 | Koivusalmi et al. | 208/19 |
| 2007/0170091 A1 | 7/2007 | Monnier et al. | |
| 2007/0260102 A1 * | 11/2007 | Duarte Santiago et al. | 585/733 |

**FOREIGN PATENT DOCUMENTS**

| | | |
|---|---|---|
| SE | 9700149 | 6/1997 |
| WO | WO 00/11117 | 3/2000 |
| WO | WO 2004/104142 | 12/2004 |
| WO | WO 2005/026297 | 3/2005 |
| WO | WO 2007/068795 | 6/2007 |

**OTHER PUBLICATIONS**

Wong, A.; Monnier, J.; Stumborg, M.; Hogan E. "Technical and Economic Aspects of Manufacturing Cetane-Enchanced Diesel Fuel from Canola Oil"; Bio-Oils Symposium: Saskatoon Saskatchewan, Canada; Mar. 2-3, 1994.

* cited by examiner



*Fig. 1*

U.S. Patent

Jul. 31, 2012

Sheet 2 of 7

US 8,231,804 B2

JA42



**Fig. 2**

U.S. Patent

Jul. 31, 2012

Sheet 3 of 7

US 8,231,804 B2

JA43



**Fig. 3**



Fig. 4

U.S. Patent

Jul. 31, 2012

Sheet 5 of 7

US 8,231,804 B2

JA45



*Fig. 5*

U.S. Patent

Jul. 31, 2012

Sheet 6 of 7

US 8,231,804 B2



**Fig. 6**

U.S. Patent

Jul. 31, 2012

Sheet 7 of 7

US 8,231,804 B2

JA47



**Fig. 7**

US 8,231,804 B2

1

# EVEN CARBON NUMBER PARAFFIN COMPOSITION AND METHOD OF MANUFACTURING SAME

## STATEMENT REGARDING FEDERALLY SPONSORED RESEARCH OR DEVELOPMENT

Not applicable.

## CROSS-REFERENCE TO RELATED APPLICATIONS

Not applicable.

## BACKGROUND OF THE INVENTION

### 1. Field of the Invention

The present invention relates to producing specialty materials and chemical intermediates from bio-renewable feedstocks such as animal fats, plant oils, algal oils, bio-derived greases, and tall oil fatty acid (hereafter referred to as biological feedstocks, or alternatively, fatty acids and/or glycerides depending upon the composition of the feedstock). Specifically, the present invention relates to predominantly even carbon number paraffin compositions in the C12-C24 range, and the catalytic hydrogenation/hydrogenolysis method used for its manufacture.

Paraffins in the C12-C24 range have useful applications as phase change material (PCM). The paraffins undergo solid-liquid phase transition in the about −9° C. (15° F.) to about 50° C. (120° F.). Heat is absorbed as the PCM paraffin melts and heat is released later when the PCM freezes. Fabricated systems that use PCM's as such are referred to as passive thermal storage devices. Due to relatively high latent heats of solid-liquid phase transition (referred to simply as latent heats hereafter), as well as compatibility with common material of construction and high stability, paraffins are considered particularly well-suited for PCM applications. Wall boards of a house impregnated with a PCM are an example of a passive thermal storage device. During a hot day, the PCM will absorb heat as it melts. Since there is no temperature change during phase transition, the surface in contact, with the thermal storage device stays at constant temperature until all. PCM therein has melted. The heat that would have made the house hot has thus been stored in the molten PCM. At night, as the temperatures get cooler, the molten PCM freezes and releases the heat thus preventing the home from getting cold. The melting-freezing cycles moderate the temperature of the space enclosed within the passive thermal storage device despite extreme night-day temperature swings outside. In general PCMs are an effective way of storing thermal energy (e.g. solar, off-peak electricity, industrial waste heat), and reducing energy demand (e.g. for heating and air-conditioning).

The thermal storage capacity of the PCM is dictated by its latent heat. The higher the latent heat, the higher the thermal storage capacity of the PCM, and the smaller the required thermal storage device size/cost.

Table 1 provides the latent heats and melting points of paraffins. As observed therein, the latent heat for even carbon number paraffins is higher than the latent heat for odd carbon number paraffins of similar transition temperature. For example, n-heptadecane (carbon number 17) and n-octadecane (carbon number 18) melt in the 22-28° C. range. Whereas the latent heat of n-heptadecane is 215 kJ/kg and the latent heat for n-octadecane is 245 kJ/kg or 14% higher. In

2

general, the even carbon number paraffin heats of fusion in the C14-C24 range are 10-16% higher than odd carbon number paraffins.

### TABLE 1

Latent Heats and Solid-Liquid Transition Temperatures of Selected Paraffins

| Name | Carbon Number | Melting Point (° C.) | Latent Heat (kJ/kg) |
|------|---------------|----------------------|---------------------|
| n-Tetradecane | 14 | 4.5-5.6 | 231 |
| n-Pentadecane | 15 | 10 | 207 |
| n-Hexadecane | 16 | 18.2 | 238 |
| n-Heptadecane | 17 | 22 | 215 |
| n-Octadecane | 18 | 28.2 | 245 |
| n-Nonadecane | 19 | 31.9 | 222 |
| n-Eicosane | 20 | 37 | 247 |
| n-Heneicosane | 21 | 41 | 215 |
| n-Docosane | 22 | 44 | 249 |
| n-Tricosane | 23 | 47 | 234 |
| n-Tetracosane | 24 | 51 | 255 |

In addition to PCM applications, even carbon number C12-C24 paraffins are also used as chemical intermediates for linear alkyl benzene (C12, C14) and alkenyl succinate (C16, C18), as well as lubricant/wax additives.

### 2. Brief Description of the Related Art

The commercially practiced synthesis of even carbon number n-paraffins involves ethylene oligomerization. Depending on the catalyst and reactor operating conditions, this process produces a distribution of linear alpha olefins in the C4 to C20+ range. Linear alpha olefins in the C4-C8 range are the main products of this process and are separated. These olefins are in high demand, mainly as comonomers for film-grade polyethylene. The C10+ even carbon number olefins are sold as intermediates for specialty chemicals, or hydrogenated to produce even carbon number n-paraffins.

This ethylene oligomerization process for producing even carbon number paraffins is highly dependent on crude oil and natural gas prices. Furthermore, n-paraffins have to be sold at a premium to the olefins to justify the added, cost of hydrogenating. These factors make the price and availability of n-paraffins thus produced highly variable.

Another method of producing n-paraffins is Fischer-Tropsch synthesis. The liquid product of this reaction is a broad distribution of even and odd carbon number paraffins, from C5 to C50+.

Naturally occurring fatty acids and esters may be hydrotreated to produce a hydrocarbon composition including even and odd carbon number paraffins as reported in prior art, namely; Wong, et. al. "Technical and Economic Aspects of Manufacturing Cetane-Enhanced Diesel Fuel from Canola Oil"; Bio-Oils Symposium, Saskatoon, Saskatchewan, Canada; March 1994. FIG. 2 of Wong et. al. includes typical gas chromatography/mass spectrometry (GC/MS) trace of hydrotreated canola oil wherein the relative heights of even and odd carbon number paraffins are similar, indicating presence of comparable concentrations of each. The prior art method for converting triglycerides and fatty acids to paraffins employs a fixed-bed catalytic reactor, packed with commercially available hydrotreating catalysts. These catalysts are cylindrical or three-fluted extrudates of alumina with nickel molybdenum or cobalt molybdenum sulfided metal activity. The typical equivalent diameter of these catalysts is from about 1.5 mm to about 2.0 mm.

The equivalent diameter is used to characterize non-spherical particles by size. Equivalent particle diameter of a non-spherical particle is defined as the diameter of a sphere having

US 8,231,804 B2

| 3 | 4 |

the same volume as the non-spherical particle. For a cylindrical catalyst of diameter D and length L, the equivalent particle diameter $D_p$ is expressed as $D_p=6(4/L+4/D)^{-1}$. For a three-fluted extrudate, the equivalent particle diameter expression is $D_p=6[2/L+5\pi/(D(\sin(60°)+1.25\pi)]^{-1}$.

The fatty acid/glyceride feed is hydrogenated and deoxygenated in the fixed bed reactor packed with commercial hydrotreating catalysts. As illustrated by Equations 1 and 2 for the example of triolein (oleic acid triglyceride), the deoxygenation is achieved by oxygen hydrogenolysis, decarboxylation (removal of CO2), and decarbonylation (loss of CO).

$$CH_2-O-CO-C_{17}H_{33}$$
$$CH-O-CO-C_{17}H_{33} + 15\ H_2 \longrightarrow 3\ C_{18}H_{38} + C_3H_8 + 6\ H_2O \quad (1)$$
$$CH_2-O-CO-C_{17}H_{33}$$

$$CH_2-O-CO-C_{17}H_{33}$$
$$CH-O-CO-C_{17}H_{33} + 6\ H_2 \longrightarrow 3\ C_{17}H_{36} + C_3H_8 + 3\ CO_2 \quad (2)$$
$$CH_2-O-CO-C_{17}H_{33}$$

In both reactions, the glycerol backbone is converted to propane and double bonds are saturated. Since one carbon is removed from the fatty acids during decarboxylation and decarbonylation reactions (as illustrated in Equation 2), odd carbon number paraffins are formed from even carbon number naturally occurring fatty acids.

To this end, there is a need for even carbon number paraffin compositions and a selective process for producing even carbon number paraffins. In particular the present invention is a process for converting biological feedstocks into even carbon number paraffin compositions.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a schematic diagram of an embodiment of an operation of a continuous process in accordance with the present invention.

FIG. 2 is a schematic diagram of an embodiment of an operation of a series-reactor process in accordance with the present invention.

FIG. 3 is a schematic diagram of an alternative embodiment of an operation of a series-reactor process in accordance with the present invention.

FIG. 4 is a schematic diagram of an embodiment of an operation of a batch process in accordance with the present invention.

FIG. 5 is a bar graph summarizing the results of Example 1.

FIG. 6 is a bar graph summarizing the results of Example 2.

FIG. 7 is a McCabe-Thiele diagram for C16-C18 paraffin separation.

## DETAILED DESCRIPTION OF THE INVENTION

The present invention relates to even carbon number paraffin compositions and a method for producing such even carbon number paraffin compositions from biological feedstocks. Paraffin compositions of the present invention have superior properties as phase PCM material.

It has been discovered that hydrocarbon compositions with very high concentrations of even carbon number paraffins can be obtained from biological feedstocks. The products are produced by a single-step hydrogenation/hydrogenolysis process of biological feedstocks. One embodiment of the process is carried out using a bimetallic catalyst of about 10 to about 500 micron equivalent particle diameter. The shorter diffusion path length, more accessible pores, and lower intra-catalyst temperature gradients in the smaller catalyst system of the present invention reduce thermal decarboxylation and consequent co-production of odd number paraffins.

One embodiment of the process of the present invention is preferably carried out with the catalyst in the slurry phase. Commercially available catalyst extrudates may, be ground and sieved to reduce the catalyst size to the preferred range of the present invention, from about 10 to about 400 microns, most preferably from about 30 microns to about 80 microns. Examples of the catalyst include but are, not limited to nickel-molybdenum (NiMo), cobalt-molybdenum (CoMo), or nickel-tungsten (NIW) on alumina or alumina phosphate supports. Pre-ground catalyst extrudates are commercially available in both oxide and active sulfide forms. The metal oxide catalysts are activated by sulfiding.

Commercial bimetallic catalysts are also available as slurry grades and well-suited for the invention disclosed herein. Preferred examples include sponge metal catalysts such as Mo promoted Raney® Ni and Co (Raney® is the trade name of the Grace Davison sponge metal catalyst). Sponge metal catalysts are formed by leaching nickel-aluminum or cobalt-aluminum alloys with concentrated caustic (sodium hydroxide) solution to form hydrogen active metal of high surface area. These slurry catalysts are active as received, but may be sulfided to achieve the desired selectivity.

Supported slurry catalysts suitable for the process of this invention may be prepared by impregnating spray-dried alumina or modified alumina supports with solutions containing nickel, cobalt, molybdenum and/or tungsten compounds before calcining.

It should be understood by one of ordinary skill in the art that any such catalyst may be utilized in the present invention so long, as the catalyst operates as described herein.

Referring now to the drawings and more particular to FIG. 1, shown therein is one embodiment of an operation of a process utilizing a continuous flow reactor constructed in accordance with the present invention. A biological feedstock 101 is pressurized to reactor pressure of about 200 psig to about 2,000 psig via pump 102. Preferred operating pressures for the slurry bubble column reactor are from about 400 to about 1,000 psig. The feed 101 comprises of vegetable oils, animal fats/greases, plant oils, tall oil fatty acid, and algal oils. Algal oils can be naturally occurring or produced in bioreactors. Pressurized liquid stream 103 enters a reactor 104.

The slurry reactor 104 is preferably a bubble column. The reactor catalyst loading is between about 1% and about 30% (dry bulk catalyst volume per total slurry volume), preferably between about 2% and about 20%. The catalyst particle size is from about 10 to about 400 microns, preferably from about 30 to about 80 microns. The throughput of the pressurized biological feed stock, 103, is between about 0.1 and about 10 LHSV (volume feed per volume catalyst per hour), preferably between about 0.5 and about 5 LHSV. These parameters set the slurry reactor 104 volume for the design feed rate.

The pressurized liquid, stream 103 reacts therein with hydrogen 105 which is optionally preheated through heater 116. The hydrogen-rich gas 105 preferably has a hydrogen concentration between 70 and 100 mol %, preferably between 80 and 99 mol %. The hydrogen-rich gas 105 is supplied at a rate of about 3,000 to about 10,000 SCF/bbl (volume gas per volume biological feedstock). The gas to feedstock ratio is preferably from about 4,000 SCF/bbl to about 8,000 SCF/bbl.

US 8,231,804 B2

5                                                                   6

The diameter of bubble column reactor vessel **104** is selected such that the gas flow rate is in the churn-turbulent regime from about 7 cm/s to about 40 cm/s, preferably from about 8 cm/s to about 12 cm/s. A heated hydrogen-rich gas **105A** is dispersed through a sparger **119**. The sparger may be of various configurations including but not limited to a ring-type sparger with multiple orifices, a sintered metal plate or sintered metal distributing pipe(s) or co-fed with the biological feedstock via a simple pipe distributor. In some embodiments the catalyst is dispersed in the slurry phase by mechanical agitation. The gas flow through the reactor **104** produces a uniform catalyst slurry **106**. Alternatively, a side arm/downcomer (not shown) can also be deployed to recirculate degassed slurry to the reactor **104** which also aides catalyst distribution in the reactor **104**. The biological feedstock converts into mainly even carbon number paraffins as it is diluted within the catalyst-paraffin slurry **106**.

The heat of reaction is in part removed by evaporation of a boiler feed water **117** in cooling tubes/coils **120**, producing steam **118**. At the hydrodynamic regimes described herein, high heat removal may be achieved with cooling coil device **120** immersed in the reactor **104**. Typical heat transfer coefficient for a steam-generating cooling coil is in the 40 to 200 Btu/hr-ft²-° F. range. The reactor temperature is thus controlled between about 450° F. (232° C.) to about 750° F. (399° C.), preferably between about 600° F. (315° C.) and about 650° F. (343° C.). At these preferred temperatures, high pressure steam (greater than about 400 psig, and preferably greater than about 600 psig) may be produced and used for driving motors, generating electricity, and/or supplying process heat.

The extent of back-mixing within the bubble column depends to a large extent on the height-to-diameter ratio of the reactor. Typical columns have successfully been modeled as 1.1-1.9 ideal CSTR's in series. At the preferred reactor design conditions, the reactor liquid composition is mainly the paraffin, and the temperature very close to uniform.

The vapor product **107** from bubble column reactor **104** is cooled in air cooler **108** wherein byproduct water and light hydrocarbons condense. At operating pressures below 500 psig and temperatures above about 315° C. (600° F.), more than about 50% of the C18⁻ paraffin, reaction product will vaporize and is condensed overhead with water and light hydrocarbons.

A three phase composition **109** is separated in separator drum **110**. The water stream **111B** and hydrocarbon **111A** are thus separated from recycle hydrogen-rich gas **111C**. In some embodiments, the hydrogen-rich gas **111C** may be purified to remove some or all of the minor reaction byproducts such as ammonia, hydrogen sulfide, and carbon oxides. Recycle hydrogen-rich gas may then be combined with makeup hydrogen to form the reactor hydrogen-rich gas **105**.

The slurry **106** is transported through conduit **112** to filter **113** to separate the catalyst from the reactor product. In some embodiments filter **113** is a cross-flow filter. In other embodiments, a hydrocyclone followed by a filter is used. It should be understood by one of ordinary skill in the art that any device capable of separating suspended solids from liquid may be used in the present invention. The catalyst slurry concentrate stream **114** returns to reactor **104**, while the filtered paraffin product **115** exits the reactor system. Product streams **115** and **111B** include equal to or greater than about 75 wt % even carbon number paraffins in the C12-C24 range. Preferably, the product streams comprise of equal to or greater than about 80 wt % even carbon number paraffins. In some embodi-

ments, the product stream may undergo further processing such as distillation to recover the even carbon number paraffin products.

In other embodiments of the present invention, a plurality of reactors are employed to divide the hydrogenation/hydrogenolysis load over two or more reactors. Those skilled in the art will recognize that, the reactors-in-series configuration is used in back-mixed reactor systems to achieve higher conversion at same or lower total reactor volume.

Referring now to FIG. 2, biological feedstock **201** is pressurized to the reactor system pressure in pump **202**. The reactor system pressures are in the same range previously specified herein. The reactor system further contains catalyst of type and size specified in the detailed description of the invention. The pressurized feed **203** is optionally heated in heater **240**. The preheated feed **203A** enters the first stage reactor **204** wherein partial conversion occurs in the catalyst slurry phase. Hydrogen-rich gas **205** is introduced into slurry bubble column reactor **204** through a sparger device (not shown) at the rates previously specified herein. Reactor **204** is equipped with cooling coils **210** to maintain the reactor at the desired temperature range previously specified. The extent of feed conversion in reactor **204** is about 10% to about 90%, preferably about 30% to about 60%. Stream **206**, the partially converted product including paraffin, biological feedstock, and reaction intermediates such as fatty alcohols, fatty acids, and olefins, is filtered through filter **207** to separate the catalyst. The catalyst rich slurry **209** is returned to the reactor **204** while the filtered, partially converted product **208** flows to second stage reactor **211**.

Typically, a reactor **211** operates under the same temperature and gas-to-oil ratio as the reactor **204**. In some embodiments the reactor **211** operates at a higher temperature than the reactor **204**. In some embodiments, the pressure in reactors **211** and **239** are lower than the reactor **204** to facilitate filtrate flow from the reactor **204** to the reactor **211**, and from the reactor **211** to the reactor **239**. After undergoing reaction with hydrogen provided by gas stream **212**, a partially converted slurry **213** undergoes solid-liquid separation in a filter **214**. A catalyst rich slurry **216** is returned to the reactor **211** while the partially converted stream **215** is transferred to the reactor **239**. The total extent of feed conversion in the reactor **211** is about 30% to about 95%, preferably between about 50% and about 80%.

Hydrogen is supplied to the reactor **239** from the gas stream **217**. The total feed conversion achieved in this slurry bubble column reactor is between about 80% and about 100%, preferably at or very near about 100% feed conversion. The temperature, pressure, and gas-to-oil ratio are in the same range described previously. However in some embodiments, the reactor **239** is operated at a higher temperature than the reactors **204** and **211**. A paraffin-catalyst slurry stream **218** is filtered in a filter **219** to supply a product stream **221** and returning high-solids slurry stream **220** to the reactor **239**. The product stream **221** includes equal to or greater than about 75 wt % even carbon number paraffins in the C12-C24 range. Preferably, the product stream **221** comprises of equal to or greater than about 80 wt % even carbon number paraffins in the C12-C24 range.

The off gas from the three slurry bubble column reactors in series, streams **222**, **223** and **224**, are combined to form a vapor stream **225**. The vapor stream **225** is cooled in a condenser **226** to a temperature from about 60° F. (15.5° C.) to about 160° F. (71° C.) preferably from about 80° F. (27° C.) to about 140° F. (60° C.). A three phase stream **227** enters drum **228** where the stream **227** is separated into a water phase **229**, a light hydrocarbon phase **230** and a gas phase **231**. The gas

US 8,231,804 B2

7

phase 231 is rich in hydrogen. The other components of the gas phase 231 include propane, other light hydrocarbons, and minor byproducts described previously. The hydrogen-rich gas stream may be partially purged (stream 232), with the rest recycled as stream 233. The aforementioned impurities may be removed in a hydrogen purification unit 234. The hydrogen purification unit 234 is typically a scrubber used to remove ammonia and hydrogen sulfide. A purified hydrogen-rich stream 235 is then combined with makeup hydrogen 238 in recycle compressor 236. A recompressed hydrogen-rich gas 237 is used to supply each of the slurry bubble column reactors.

In an alternative embodiment of an operation of a reactors-in-series process of the present invention, a slurry bubble column reactor containing catalyst of the type and size previously described herein may be followed by a fixed-bed reactor. Referring to FIG. 3, the biological feedstock 251 is pressurized by pump 252 to the reactor system pressure previously specified herein. The pressurized biological feedstock is heated by the reactor feed effluent exchanger 254. A heated stream 255 enters a slurry bubble column reactor 257 where a catalyst of the type and size-range previously described herein is suspended in the slurry phase by sparging of hydrogen-rich gas 258. Reactor 257 is equipped with cooling coils 256 to control the temperature at target value within the range previously specified herein. A partially converted effluent slurry 259 is processed through filter 260. A catalyst rich slurry 262 is returned to the reactor 257 while a filtered partially converted product 261 is transferred to a fixed-bed reactor 264 for achieving full conversion. Before entering the reactor 264, the liquid feed is mixed with optionally preheated hydrogen 286. A combined feed 263 trickles through the fixed-bed reactor 264 wherein the partially converted feedstock and reaction intermediates are fully converted to a predominantly even carbon number paraffin composition. The fixed-bed reactor 264 is operated adiabatically and the temperature is allowed to rise within the preferred range previously specified herein. A reactor effluent 265 is partially cooled in exchanger 254. A partially cooled product 266 enters high pressure separator 267 wherein the hydrogen-rich vapor stream 270 is separated from a mainly even carbon number paraffinic liquid product 268. The liquid product 268 may be further processed through distillation to recover the desired even carbon number paraffin composition previously specified herein.

The hydrogen-rich gas streams 270 and 269, from the high pressure separator 267 and the slurry bubble column reactor 257 respectively, are combined to form vapor stream 271. Water 271A is added to vapor stream 271 to wash any deposits that may form upon condensation in a condenser 272. A cooled stream 273 is a three phase composition which is separated in drum 274. The liquid fractions include byproduct water 275 and light hydrocarbons 276. A hydrogen-rich gas 277 is partially purged as stream 278. The rest of the gas stream 279 is optionally treated in purification unit 290 to remove ammonia, hydrogen sulfide, and other byproducts of the hydrogenation/hydrogenolysis reaction. A purified hydrogen-rich gas 280 is combined with makeup hydrogen 282 in recycle compressor 281. A recompressed hydrogen-rich gas 283 is optionally heated in heater 284 before supplying the slurry bubble column 257 and the fixed-bed reactor 264.

The slurry catalyst reaction may also be conducted in batch mode. This may be a preferable embodiment when large volume production is not sought, or when the paraffin products from different feed stocks need to be segregated.

8

Referring to FIG. 4, a biological feedstock 301 is charged to a batch stirred reactor 302. The reactor 302 is equipped with an agitator assembly 303 for suspending solids and dispersing gas, and a jacket 304 for heat transfer. A slurry catalyst 306 is then added to the reactor 302. The catalyst is of the type and size-range previously described herein. The reactor is then purged and pressurized with hydrogen 307 to the target operating pressure. Pressure ranges described previously for the continuous reactor embodiments are applicable to the batch reactor embodiment as well. These preferred pressures are from about 400 psig to about 1,000 psig.

The reactor 302 is then heated to a target operating temperature in the range previously described for the continuous reactor embodiments, preferably between 450° F. (232° C.) and 650° F. (343° C.). The operating temperatures may be achieved by circulation of a heat transfer fluid 308 through the reactor jacket 304. Once at target temperature, the heat transfer fluid 308 is used for cooling. The hydrogen 307 supply rate is used to limit the release of reaction heat through a temperature control loop 309. In some embodiments, the hydrogen flow rate is maintained constant and the reactor pressure is controlled through a back pressure control loop 310, while temperature is controlled through circulation rate of the heat transfer fluid. In some embodiments, reactor 302 is equipped with a cooling coil (not shown) to increase heat removal and shorten batch cycle.

The batch reactor is equipped with piping 312, 312A, and condenser 318. Condensable byproducts of the hydrogenation/hydrogenolysis reaction which occurred in reactor 302, light hydrocarbons and water, are thus collected in drum 314 after cool-down with coolant 316 in condenser 318. Upon completion of the reaction, when no more H2 consumption is observed, the reactor 302 is cooled to about 140° F. (60° C.) to about 160° F. (71° C.) and the products and byproducts are, drained out through conduits 320 (water, followed by light hydrocarbons) and 322 (main paraffin product). Most of the catalyst settles to the bottom of reactor 302 after agitation has been turned off, for reuse in the next batch. The suspended catalyst fines are removed from the n-paraffin product through filter 324. Sintered metal or cartridge elements may be used for catalyst filter 324. A filtered product 326 has the same even carbon number paraffin composition previously described in the continuous flow reactor embodiments of the present invention.

In order to further illustrate the present invention, the following examples are given. However, it is to be understood that the examples are for illustrative purposes and are not to be construed as limiting the scope of the subject invention.

EXAMPLES

Example 1

Hydrogenation/Hydrogenolysis of Canola Oil with 1/16" Trilobe Catalyst Extrudates ($D_p$~1.2 mm) in a Fixed-Bed Reactor

The present example demonstrates the conversion of a biological feedstock, canola oils, into paraffinic compositions using standard-size catalyst extrudates. A 100 cc isothermal tubular reactor was filled with 80 cc of a commercially available NiMo catalyst (purchased from Catalyst Trading Corporation, Houston, Tex.) of 1.2 mm equivalent particle diameter, and 70-100 mesh glass beads. The catalyst was sulfided in the presence of hydrogen with dimethyl disulfide at two hold temperatures: 6 hours at 400° F. and 12 hrs at 650° F. Hydro-

US 8,231,804 B2

| 9 | 10 |

gen sulfide break-through was confirmed before the temperature was raised from 400° F. (204° C.) to 650° F. (343° C.) at 50° F./hr. After sulfiding, the reactor was cooled to 400° F. (204° C.).

Next a fatty triglyceride feed was introduced to the isothermal reactor. The reactor was slowly heated to 650° F. to achieve full conversion of the triglyceride feed to a paraffin composition. The reactor temperature was further increased to 700° F. (371° C.) to maintain good catalyst activity at 80 cc/hr feed rate (1.0 hr⁻¹ LHSV). Canola oil feedstock was then introduced at these reactor conditions.

The product was analyzed using a gas chromatography (GC) method involving calibration with n-paraffin standards. The results of feed conversion to paraffins are summarized in FIG. 5. As observed therein, a significant percent of C17 paraffins was produced from decarbonylation/decarboxylation of C18 fatty acids. The overall concentration of even carbon number paraffins was only 61 wt %.

### Example 2

#### Hydrogenation/Hydrogenolysis of Canola Oil with Crushed and Sieved Catalyst ($D_p$=30-80 Micron) in Slurry Reactor

The catalyst used in Example 1 was discharged from the reactor, crushed, and sieved into a 30-80 micron particle-size cut. Ten (10) grams of the 30-80 micron cut of the ground catalyst was combined with 300 g of canola oil in a 1 liter Autoclave stirred-reactor. The agitation was set at 1000 rpm. The reactor was purged with N2 before starting H2 flow at 3 L/min. The reactor was controlled at 500 psig pressure. The temperature was ramped at 1° F./min to hold temperatures of 450° F. (232° C.), 500° F. (260° C.), 550° F. (288° C.), and 600° F. (316° C.). Liquid samples were obtained at each hold temperature and analyzed by GC. The hold times were 20 hrs at 450. ° F. (232° C.), 5 hrs at 500° F. (260° C.), 23 hrs at 550° F. (288° C.), and 19 hrs at 600° F. (316° C.).

The results of the slurry catalyst conversion reaction are summarized in FIG. 6. It is thus observed that most of the C18 and C16 fatty acids in the canola oil were converted to C18 and C16 paraffins, suggesting a high selectivity for the oxygen hydrogenolysis mechanism and low decarboxylation/decarbonylation. The overall concentration of even carbon number paraffins was 80 wt %.

### Example 3

#### Even Carbon Number Paraffin Composition from Rapeseed Oil

Rapeseed oil was the third largest source of vegetable oil in the world (USDA year 2000 statistics), behind palm and soybean oils. The oil yield from rapeseed is 40-50%, compared to only 20 percent for soybeans. Table 2 summarizes the fatty acid profile of representative biological feedstocks.

TABLE 2

| Fatty Acid Composition of Several Common Biological Feedstocks[1–5] | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Saturated Acids | | | | | | | Mono-Unsaturated Acids | | Poly-Unsaturated Acids | |
| | | | | | | | Eicosenic/ | | | Eicosenic/ | |
| | Caprylic C8:0 wt % | Capric C10:0 wt % | Lauric C12:0 wt % | Myristic C14:0 wt % | Palmitic C16:0 wt % | Stearic C18:0 wt % | Behenic C20:0/C22:0 wt % | Palmeic C16:1 wt % | Oleic C18:1 wt % | Behenic C20:1/C22:1 wt % | Linoleic C18:2 wt % | Linolenic C18:3 wt % |
| **Animal fats** | | | | | | | | | | | | |
| Chicken Fat | — | — | — | — | 7 | 2 | — | — | 69 | — | 17 | — |
| Beef Tallow | — | — | 0.2 | 2-3 | 24-30 | 21-26 | 0.4-1 | — | 39-43 | 0.3 | 2-3 | 1 |
| Yellow Grease | — | 3 | 3 | 1-11 | 23-27 | 10-12 | — | 1 | 29-60 | — | 2-15 | 1 |
| Choice White Grease | — | 7 | 3 | 9 | 25 | 12 | — | — | 27 | — | 1-3 | 1 |
| Lard (pork fat) | — | — | — | 1-2 | 25-30 | 12-16 | — | 2-5 | 41-51 | 2-3 | 4-22 | 0.2 |
| **Vegetable Oils** | | | | | | | | | | | | |
| Soybean Oil | — | — | — | 0.3 | 7-11 | 3-6 | 5-10 | 0-1 | 22-34 | — | 50-60 | 2-10 |
| Corn Oil | — | — | — | 0-2 | 8-11 | 1-4 | — | 1-2 | 28-50 | 0-2 | 34-58 | 1 |
| Cottonseed Oil | — | — | — | 0-3 | 17-23 | 1-3 | — | — | 23-41 | 2-3 | 34-55 | 1 |
| Canola Oil | — | — | — | — | 4 | 2 | — | — | 62 | — | 22 | 10 |
| Coconut Oil | 5-9 | 4-10 | 44-51 | 13-18 | 7-10 | 1-4 | — | — | 5-8 | — | 1-3 | — |
| Sunflower Oil | — | — | — | — | 6-7 | 4-5 | 1.4 | — | 19 | — | 68-69 | 0.3-1 |
| Palm Oil | — | — | — | 1-6 | 32-47 | 1-6 | — | — | 40-52 | — | 2-11 | — |
| Palm Kernel Oil | 2-4 | 3-7 | 45-52 | 14-19 | 6-9 | 1-3 | 1-2 | 0-1 | 10-18 | — | 1-2 | — |
| Rapeseed (High Eurcic) | — | — | — | — | 2-5 | 1-2 | 0.9 | 0.2 | 10-15 | 50-60 | 10-20 | 5-10 |

[1]http://www.scientificpsychic.com/fitness/fattyacids.html

[2]Kinast, J. A. March 2003, *"Production of Biodiesel from Multiple Feedstocks and Properties of Biodiesel/Diesel Blends*, NREL/AR-510-31460

[3]Tyson, K. S, NREL Presentation *"Biodiesel for New England"* Mar. 26, 2003

[4]*Food Fats and Oils, Institute of Shortening and Edible Oils*, Ninth Edition 2006

[5]a "—" in a cell means that this constituent is not present

US 8,231,804 B2

11 12

As observed therein rapeseed oil consists of 50-60 wt % C22 fatty acids with the balance mainly C18 fatty acids. According to the inventive conversion process disclosed herein, rapeseed oil will produce an even carbon number composition comprising of a ratio of about 1:1 to 1.5:1 C22: C18 n-paraffins. This composition is useful as a PCM in construction or textile/clothing application for high temperatures, including desert climates when day times can surpass 44° C. (melt point of C22 paraffin), and, night, times below 28° C. (freeze point of C18 paraffin). The high temperature phase transition makes this PCM composition well suited for computer cooling applications (i.e. heat sink or cooling pad under the computer) as well.

Example 4

Even Carbon Number Paraffin Compositions from Palm Oil and Palm Kernel Oil

Palm oil recently surpassed soybean oil as the largest volume plant oil produced in the world. Whereas palm oil itself is derived from the fruit of the palm tree, the palm kernel oil is extracted from the fruit's seeds. Referring to Table 2, palm oil consists of about 40 wt % C16 fatty acids, with the balance mainly C18 fatty acids. According to the method of the present invention, the palm oil is converted to a mainly even carbon number paraffin composition in the C16-C18 range with C18:C16 weight ratio of about 1.5:1. The composition is useful as a PCM for construction and textile/clothing applications in the 18° C. to 28° C. range.

Referring to Table 2 palm kernel oil has a fatty acid composition of about 45-52 wt % C12, 14-19 wt % C14, 6-9 wt % C16, and 11-17 wt % C18. According to the present invention, the biological feedstock is converted to a mainly even carbon number n-paraffin composition including C12, C14, C16, and C18 components. The n-paraffin composition may be distilled to yield a C12/C14 composition suitable for very low temperature PCM applications (such as for bridge warmers and dive suites) or as chemical intermediates (such as for producing linear alkyl benzenes).

Example 5

Separation of Even Carbon Number Paraffins Derived from the Method of the Present Invention

The method of the present invention may be used to convert most animal fats into a composition with approximately 30 mol % C16 n-paraffins and the balance mainly C18 paraffin. Vacuum distillation is a well understood and broadly practiced separation technology. At 20 torr pressure, the vapor-liquid equilibrium (VLE) constants ("K-values") for n-octadecane and n-hexadecane are 1.34 and 0.82 respectively (computed using HYSYS simulation software's Peng-Robinson thermodynamic model). These K-values may be used to generate the equilibrium curve of FIG. 7. Distillation column

operating lines have been added according to the McCabe-Thiele methodology as disclosed in prior art, namely, Foust et. al. *Principles of Unit Operations*, 2nd Ed.; John Wiley & Sons: New York, 1980; Chapter 7. According to McCabe-Thiele procedure for distillation column design, with a reflux ratio of 6.5, or 30% higher than minimum reflux, a separation yielding 90 mol % purity C18 and C16 n-paraffin products requires 14.5 theoretical stages. Assuming 73% tray efficiency, the vacuum tower requires 20 actual trays.

While the C18 product of the separation can be sold as a PCM for narrow temperature control applications, the C16 n-paraffin (n-hexadecane or cetane) has other markets. One large volume application is diesel fuel additive. Another use of linear C16 hydrocarbons is as intermediates for specialty chemicals including alkenyl succinates for paper coatings.

The analysis of this example shows that the even carbon number compositions of the present invention, such as those derived from animal fats/greases, are well suited for producing chemicals using conventional separation techniques.

While the compositions and methods of this invention have been described in terms of preferred embodiments, it will be apparent to those of skill in the art that variations may be applied to the process described herein without departing from the concept and scope of the invention. All such similar substitutes and modifications apparent to those skilled in the art are deemed to be within the scope and concept of the invention as it is set out in the following claims.

What is claimed is:

1. A phase change material composition comprising at least 75 wt % even carbon number paraffins, wherein the paraffins are produced by hydrogenation/hydrogenolysis of naturally occurring fatty acids and esters.

2. The composition of claim 1 comprises at least 80 wt % even carbon number paraffins.

3. The composition of claim 1 wherein the even carbon number paraffins comprise n-hexadecane and n-octadecane.

4. The composition of claim 1 wherein the even carbon number paraffins comprise n-octadecane and n-docosane.

5. The composition of claim 1 wherein the even carbon number paraffins comprise n-dodecane and n-tetradecane.

6. The composition of claim 1 wherein the composition is used in thermal storage devices.

7. The composition of claim 1 wherein the composition is used as feedstock to produce even carbon number n-paraffin products.

8. The composition of claim 1 wherein the hydrogenation/hydrogenolysis occurs in the presence of a catalyst containing nickel, molybdenum, cobalt, and/or tungsten.

9. The composition of claim 8 wherein the catalyst has an equivalent diameter of about 400 microns or less.

10. The composition of claim 8 wherein the catalyst has an equivalent diameter of about 80 micron or less.

11. The composition of claim 10 wherein the hydrogenation/hydrogenolysis occurs in slurry phase.

* * * * *

Form 30

FORM 30. Certificate of Service

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

# CERTIFICATE OF SERVICE

I certify that I served a copy on counsel of record on September 23, 2015
by:

      ☐ U.S. Mail

      ☐ Fax

      ☐ Hand

      ☒ Electronic Means (by E-mail or CM/ECF)

| Jeanne M. Gills | /s/ Jeanne M. Gills |
|---|---|
| Name of Counsel | Signature of Counsel |

| | |
|---|---|
| Law Firm | Foley & Lardner LLP |
| Address | 321 North Clark Street, Suite 2800 |
| City, State, Zip | Chicago, Illinois 60654 |
| Telephone Number | 312-832-4500 |
| Fax Number | 312-832-4700 |
| E-Mail Address | jmgills@foley.com |

NOTE: For attorneys filing documents electronically, the name of the filer under whose log-in and password a document is submitted must be preceded by an "/s/" and typed in the space where the signature would otherwise appear. Graphic and other electronic signatures are discouraged.

Reset Fields

FORM 19. Certificate of Compliance With Rule 32(a)

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.   This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) or Federal Rule of Appellate Procedure 28.1(e).

☒  The brief contains  [*state the number of* ]  13,963  words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii), or

☐  The brief uses a monospaced typeface and contains  [*state the number of* ] ☐ lines of text, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2.   This brief complies with the or typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) or Federal Rule of Appellate Procedure 28.1(e) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

☒  The brief has been prepared in a proportionally spaced typeface using

[*state name and version of word processing program* ]  MS Word 2010 Version 14.0.7145.5000  in

[*state font size and name of type style* ]  14 point Times New Roman  , or

☐  The brief has been prepared in a monospaced typeface using

[*state name and version of word processing program* ] ☐ with

[*state number of characters per inch and name of type style*] ☐ .

/s/ Jeanne M. Gills
_____
(Signature of Attorney)

Jeanne M. Gills
_____
(Name of Attorney)

Counsel for Appellant REG Synthetic Fuels, LLC
_____
(State whether representing appellant, appellee, etc.)

September 23, 2015
_____
(Date)

Reset Fields